FILED
United States Court of Appeals
Tenth Circuit

July 30, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LEVEL 3 COMMUNICATIONS,
LLC,

      Plaintiff-Appellee,

v.

LIEBERT CORPORATION, and
STILLWELL-HANSEN, INC.,

      Defendants-Appellants.

No. 06-1247

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 03-cv-1829-EWN-CBS)**

---

Andrew M. Low (Dale R. Harris, Rudy E. Verner, and Elizabeth H. Titus with
him on the briefs) Davis Graham & Stubbs LLP, Denver, Colorado for
Appellants.

Richard P. Barkley (James S. Hardy with him on the brief) Brownstein Hyatt
Farber Schreck, P.C., Denver, Colorado for Appellee.

---

Before **HARTZ**, **McKAY**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

      Level 3 Communications, LLC and Liebert Corporation entered into a

contract in 2000 to purchase several uninterruptible power supply (UPS) systems

for Level 3's New York City data center. The UPS systems contain batteries to provide power during outages. When the batteries for the New York order were delayed by the batteries' manufacturer (not Liebert), Level 3 pressured Liebert to come up with an alternative solution. In response, Liebert located another set of batteries and sold them to Level 3 as a supplement to the existing order.

Level 3 eventually discovered that the additional batteries were approximately two years old when Liebert sold them. The contract, Level 3 argued, required all equipment sold by Liebert, including UPS system batteries, to be new. Liebert, however, concluded the contract did not apply to the batteries and rejected Level 3's demand to indemnify it against any losses on account of the old batteries.

Level 3 sued Liebert and Liebert's agent, Stillwell-Hansen, Inc.,[1] alleging breach of contract and various tort claims. The district court ruled as a matter of law that the batteries at issue in this case were covered by the contract and instructed the jury accordingly. The jury found for Level 3 on all claims.

On appeal from the jury's verdict, Liebert argues the district court erred in construing the contract to apply to the batteries at issue in this case. We conclude the contract is ambiguous on whether it applies to the batteries, and thus Liebert should have been allowed to present extrinsic evidence and argue to the jury that

---

[1] Unless context indicates otherwise, we refer to Defendants collectively as "Liebert."

the contract does not cover the batteries. The district court erred in concluding otherwise.

Accordingly, we VACATE the jury's verdict and REVERSE and REMAND for new trial.

## I. Background

### A. Factual History

During a three-day jury trial, the parties presented the following evidence.

*Equipment for Telecommunications Data Centers*

Level 3 creates telecommunications networks—a kind of data highway—that form the internet's backbone. To operate its networks, Level 3 builds data facilities, known as co-location centers, about every 60 miles. Each co-location center, typically located in a metropolitan area, represents an internet-ready facility that Level 3 can lease to companies whose businesses rely heavily on internet connectivity.

By leasing one of Level 3's co-location centers, a customer can install its computers and take advantage of Level 3's networks. Because damage to computers can lead to loss of data, which carries potentially disastrous consequences for the center's lessees, Level 3 offers a host of protections. A high quality co-location center comes equipped with raised floors and powerful air conditioning units to prevent overheating; surge protectors to guard against

equipment damage from sudden spikes in the power supply; and power generators to ensure against long-term loss of power from a utility.

Most critically, Level 3 installs in each co-location center multiple UPS systems. UPS systems, as their name suggests, guarantee that absolutely no loss of power occurs. In the event of a power outage from the utility company, power generators take over, but only after the initial 7 to 15 seconds that it takes for them to start. In this short interval, when no other power source is available, a UPS system ensures that all critical components of a co-location facility—for example, data storage devices—continue to receive power. Not surprisingly, one of UPS systems' main components are their batteries, which contain the power these systems need to function.

Liebert manufactures various equipment used in co-location centers. Among other things, Liebert manufactures UPS systems, although not the accompanying batteries. Those are produced by GNB Technologies (GNB), among other battery manufacturers. Stillwell-Hansen is Liebert's authorized sales representative and represented Liebert in its business transactions with Level 3.

*The Agreement Between Level 3 and Liebert*

In December 1999, Level 3 and Liebert signed a basic purchase agreement (Agreement) for buying Liebert "hardware[,] referred to as the 'Products'" in the Agreement. Aplt. App. 56. The Products to which the Agreement applies "and other terms and conditions relevant thereto shall be described in a Product and

-4-

Pricing Attachment to be executed by the parties hereto (the 'P&P Attachments')." *Id.* The P&P Attachment accompanying the Agreement lists various hardware, including UPS systems. The batteries, however, are not specifically mentioned as one of the Products, although without a battery a UPS system loses its functionality.

The Agreement also contains Liebert's general warranty for the Products. Liebert "represents and warrants that all Products . . . purchased and delivered hereunder shall be new, of good quality and workmanship, and shall be free from defects in material and workmanship." *Id.* at 61. But the "warranty for *third-party accessories* shall be limited to those provided by such third parties." *Id.* (emphasis added). The Agreement does not define the term "third-party accessories."

After entering into the Agreement, Level 3 purchased from Liebert somewhere between 50 and 100 UPS systems in the first half of 2000 alone. All of these orders included batteries, which were shipped from the third-party battery manufacturer directly to Level 3's job sites. At the sites, Level 3's contractors installed the batteries and connected them to Liebert's UPS systems. In every order, the batteries were brand new.

*July 2000 Order for UPS Systems and Batteries*

In 1999 and 2000, in the midst of the dot-com boom when demand for co-location facilities was high, Level 3 was developing a co-location project in a

New York City building, known as the Mondo Condo. An eleven-story building, the Mondo Condo was to provide several co-location centers on different floors, each leased to a different customer. This case centers around equipment ordered for the seventh floor.

For that floor, on July 11, 2000 Level 3 ordered from Liebert a number of UPS systems. As part of this order, Level 3 also purchased UPS system batteries rated for 15 minutes of ride-through time, which is the specification indicating how long a battery can carry power to a UPS system in the event of a power outage. As with all previous orders, Liebert was to ship the UPS systems and the battery manufacturer was to ship the batteries directly to the Mondo Condo, where Level 3's contractor would assemble them.

Keith Driscoll, a Stillwell-Hansen employee, handled sales for the Mondo Condo site. On September 27, 2000, at a weekly meeting between Level 3 and Liebert, Driscoll informed Anthony Sirotka, Level 3's project manager for the Mondo Condo, that the batteries order would be delayed until March 2001. The battery manufacturer was about six months behind in production because of the dot-com boom. Sirotka became very upset, shouted and cursed at Driscoll, and demanded that Driscoll find replacement batteries within a matter of hours. According to Driscoll's testimony, Sirotka even suggested that a ride-through time shorter than 15 minutes would suffice if Driscoll could quickly locate

replacement batteries. But Sirotka and other Level 3 representatives testified that Driscoll was the one to suggest a shorter, six-minute alternative.

Still on September 27, right after the meeting, Driscoll was able to locate four six-minute batteries to replace the delayed order of 15-minute batteries. The six-minute batteries were in storage after a cancelled order, and some were up to two years old, but Driscoll also learned the batteries were in good condition. Immediately after he located the six-minute batteries, Driscoll sent an email to Sirotka. In that email, Driscoll noted the $156,828 "deduct to change the battery from GNB 15 minute to the 6 minute GNB," and also mentioned "[t]his new battery can be on site in four weeks." *Id.* at 1615.

Although Sirotka and Driscoll both testified that Sirotka had never asked about the replacement batteries' age or storage conditions, their testimonies diverge regarding what Driscoll had disclosed about the batteries. According to Driscoll's testimony, he had specifically told Sirotka on September 27—as well as repeating the same to Sirotka and other Level 3 representatives during the next-day conference call—that the batteries were coming from storage because of a cancelled order, and were up to two years old but in good condition. Sirotka, on the other hand, testified Driscoll had never explained the six-minute batteries were anything but factory-fresh, coming to Level 3 directly from the manufacturer. In fact, Sirotka and his two managers at Level 3 all testified they had understood Driscoll's use of the word "new" in reference to the six-minute

-7-

batteries to mean the batteries would be brand-new, just like all other batteries Level 3 had been ordering from Liebert.

Approximately two weeks later, on October 6, 2000, Driscoll sent Sirotka another email. In the email, Driscoll explained Level 3's two options regarding the six-minute batteries. He told Sirotka, "If you [sic] intention is to use both batteries, you will need to buy these in addition to the original order," quoting a total price of $448,280. *Id.* at 1619. If, on the other hand, Level 3 "want[s] to just replace the battery . . . it will be a deduct," just as Driscoll had explained in the September 27 email. *Id.* Sirotka's same-day response instructed Driscoll to "order the 6 minute batteries ASAP" and to "retain our original order for the 15 minute batteries which will need to be installed when they arrive." *Id.*

Based on this email exchange, Driscoll understood the six-minute batteries to represent merely a temporary solution, to be replaced with the 15-minute batteries when they arrive. That understanding was consistent with what Driscoll subsequently learned in the September 28 conference call with Level 3 representatives, during which they discussed the temporary nature of the six-minute batteries solution. Moreover, Driscoll recalled that Level 3 representatives, in a later meeting, conceded that the six-minute batteries were always considered to be temporary. Sirotka and the other Level 3 representatives, however, testified that the six-minute solution was permanent. Whatever the true state of affairs, there is no evidence that Level 3 ever communicated to Liebert its

-8-

understanding that the solution was meant to be permanent. The only communication—Sirotka's email instructing Driscoll to add the six-minute batteries to the original order and explaining the 15-minute batteries "will need to be installed when they arrive," *id.* at 1619—indicated the six-minute batteries were temporary.

After receiving Sirotka's instruction to order the six-minute batteries in addition to the 15-minute order, Driscoll faxed him a formal quotation for the six-minute batteries. Sirotka immediately signed the quotation and, several weeks later, submitted a corresponding purchase order, finalizing the transaction for Level 3 to receive two sets of batteries. Never before in the course of business between Level 3 and Liebert did the parties face a situation requiring a replacement order of batteries for a UPS system.

*Both Sets of Batteries Arrive*

The six-minute batteries arrived at the Mondo Condo in November and December 2000. Without inquiring why these batteries, unlike batteries in all previous orders from Liebert, did not arrive directly from the manufacturer, Level 3 installed them on the seventh floor. The floor then stood vacant until November 2001, when Level 3 leased it to Lehman Brothers Holdings, Inc.

While the floor still stood vacant, in March 2001 the original, 15-minute batteries arrived from the manufacturer. There is no indication these batteries were anything other than brand-new, factory-fresh. Level 3 did not, however,

swap the 15-minute batteries for the already-installed six-minute batteries, but instead put them into storage, where they remained through the time of the trial.

Lehman Brothers, after leasing the seventh floor of the Mondo Condo, tested the installed six-minute batteries. The test revealed the batteries retained only 68 percent of their rated capacity, well below the 80 percent industry standard. Unsatisfied with the batteries, Lehman Brothers demanded that Level 3 replace them. Level 3, in turn, asked Liebert to pay for the replacement. Liebert refused to accept responsibility for the six-minute batteries.

### B. Procedural History

Level 3 sued Liebert for breach of contract, alleging Liebert failed to provide new batteries and to indemnify Level 3 in connection with the batteries. Level 3 also alleged intentional misrepresentation, fraudulent concealment, and negligent misrepresentation claims against both Liebert and Stillwell-Hansen.

Before trial, both Defendants moved for summary judgment on all claims. In ruling against them, the district court concluded, as a matter of law, that the Agreement between Level 3 and Liebert applied to the batteries at issue in the case. In other words, the term "Products" in the Agreement encompassed batteries as well as UPS systems. Consistent with that interpretation, the district court, over Liebert's objection, instructed the jury as follows: "the term 'products,' as used in the agreement, included batteries that Liebert sold to Level

3. Therefore, Liebert's obligation to provide . . . new and good quality products[] applied to the batteries at issue in this case."[2]  *Id.* at 1535.

The jury awarded Level 3 damages in the amount of $1,157,000 on breach of contract, fraudulent concealment, and negligent misrepresentation claims.  In addition, Level 3 received $525,000 in punitive damages on the fraudulent concealment claim.  While finding that Level 3 proved its claim for intentional misrepresentation, the jury concluded Level 3 did not prove that the claim caused damages.

Liebert now appeals the jury's verdict on breach of contract, fraudulent concealment, and negligent misrepresentation claims.  Level 3 does not cross-appeal on the intentional misrepresentation claim.

## II.  Analysis

Liebert argues (1) the Agreement does not apply to UPS system batteries, (2) the economic loss rule precludes Level 3's negligent misrepresentation claim, (3) the fraudulent concealment claim should have been dismissed because Liebert owed Level 3 no duty to disclose the six-minute batteries were not new, and (4) the punitive damages award should be stricken.  In essence, Liebert asks us to reverse the jury's verdict on all claims and direct a judgment in its favor.

---

[2]  The district court read the instructions to the jury without giving them a written copy.  *Id.* at 1515 ("You will not receive the instructions in writing, and you will not be allowed to ask after you begin to deliberate that a particular phrase or a particular part of an instruction be read back to you.").

Our reading of the Agreement reveals an ambiguity regarding whether the batteries at issue in this case were Products. For this reason, the interpretation question should have been submitted to the jury. The district court's contrary conclusion, construing the Agreement as a matter of law, was therefore incorrect. And because the error was not harmless, we order a retrial. Because we disagree with Liebert's argument that Level 3's tort claims should have been dismissed as a matter of law, the retrial should include the breach of contract, fraudulent concealment, and negligent misrepresentation claims.

We address the Agreement first and then turn to Liebert's arguments related to tort claims.

## A. Interpreting the Agreement

The district court interpreted the Agreement as a matter of law and instructed the jury accordingly. Thus, the first issue on appeal "is at bottom a question of contract interpretation, one which we review *de novo*" under applicable law. *Allison v. Bank One-Denver*, 289 F.3d 1223, 1244 (10th Cir. 2002). De novo review is particularly appropriate when, as here, "the district court's interpretation of the contract . . . turned on an analysis of the language and an application of the principles of contract interpretation, rather than upon the credibility of extrinsic evidence." *Milk 'N' More, Inc. v. Beavert*, 963 F.2d 1342, 1345 (10th Cir. 1992). Likewise, "we review de novo legal objections to the jury instructions." *Daniel v. Ben E. Keith Co.*, 97 F.3d 1329, 1334 (10th Cir. 1996).

## 1. Colorado Law of Contract Interpretation

Under Colorado law, contracts "should be interpreted consistently with the well-established principles of contractual interpretation." *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002). Courts "must examine [contractual] terms and attempt to determine the intent of the parties." *East Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 973 (Colo. 2005). What courts are after is the parties' mutual intent. *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313 (Colo. 1984). Absent an indication the parties chose to deviate from plain meaning, "the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words used." *East Ridge*, 109 P.3d at 974. In other words, common usage prevails, and "strained constructions should be avoided." *Allstate*, 52 P.3d at 819.

To determine the meaning of a contract, courts must "examin[e] the entire instrument, and not . . . view[] clauses or phrases in isolation." *Id.* But while every relevant provision must be considered and given effect, "a more specific provision controls the effect of general provisions." *E-470 Pub. Highway Auth. v. Jagow*, 30 P.3d 798, 801 (Colo. Ct. App. 2001), *aff'd*, 49 P.3d 1151 (Colo. 2002). As an overarching principle, in construing a contract courts must also "consider the subject matter, the object of making it, the sense in which the parties naturally understood it at the time it was made, and the purposes and objects to be

-13-

accomplished thereby." *Total Petroleum, Inc. v. Farrar*, 787 P.2d 164, 167 (Colo. 1990) (quotation and alteration marks omitted).

When a contractual provision unambiguously resolves the parties' dispute, the interpreting court's task is over. "It is axiomatic that in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence." *Pepcol*, 687 P.2d at 1314. When, on the other hand, "an ambiguity has been determined to exist, the meaning of its terms is generally an issue of fact to be determined in the same manner as other factual issues." *East Ridge*, 109 P.3d at 974. Extrinsic evidence, for example, becomes admissible to determine the meaning of a contractual provision at issue. "This extrinsic evidence may include any pertinent circumstances attendant upon the transaction, including the conduct of the parties under the agreement." *Pepcol*, 687 P.2d at 1314. Courts in Colorado "have found the conduct of the parties before the controversy arose to be a reliable test of their interpretation of the agreement." *East Ridge*, 109 P.3d at 975.

Determining whether "a written contract is ambiguous is a question of law." *Id.* It is not enough that the parties disagree about the meaning. *Id.* "Rather, a contract is ambiguous [only] if it is fairly susceptible to more than one interpretation." *Id.* (quotation omitted). In guiding this determination, however, Colorado law no longer restricts the interpreting court to the four corners of the contract. *Id.* Where appropriate, "extrinsic evidence may be conditionally admitted to determine whether the contract is ambiguous." *Id.* This evidence,

-14-

though, must be stricken if the court, after considering the evidence, has determined no ambiguity exists. *Pepcol*, 687 P.2d at 1314 n.3.

### 2. Application:  The Agreement Is Ambiguous

Examining the Agreement, we conclude it does not unambiguously apply to the batteries at issue in the case.  In explaining our reasoning, we consider batteries ordered with a UPS system and batteries ordered separately that could provide a temporary source of power while the original (but delayed) batteries are being delivered.  The possibility that batteries might be ordered separately, as a temporary solution, convinces us the Agreement is ambiguous with respect to the batteries at issue in this case.

*Batteries Purchased as Part of a UPS System*

The Agreement applies to "Products," defined as hardware that "shall be described in a Product and Pricing Attachment . . . (the 'P&P Attachment')." Aplt. App. 56.  The P&P Attachment lists several hardware items.  Among them are UPS systems.  UPS system batteries, however, are not specifically mentioned.

This omission raises the following question.  Where the P&P Attachment reads "Uninterruptible Power Supply Systems," which ending applies:  "including batteries" or "batteries not included"?  What, in other words, was the common usage, "the plain and generally accepted meaning of the words used," *East Ridge*, 109 P.3d at 974, that would have been mutually understood by Liebert and Level 3 when they entered into the Agreement?

At least with respect to batteries ordered as part of complete UPS systems, the Agreement's term "Products" might encompass the batteries. Three pieces of extrinsic evidence suggest as much. First, the parties' prior course of dealings shows that batteries were likely understood to be a component of UPS systems sold under the Agreement. In the first half of 2000, Level 3 purchased between 50 and 100 UPS systems from Liebert. Each order came with brand-new, factory-fresh batteries, just as one would expect if batteries were Products, which Liebert expressly warrantied under the Agreement to be delivered new. Ordinary course of business between Liebert and Level 3 thus strongly suggests the parties understood UPS systems and batteries to go together. The UPS system, after all, cannot function properly without this key component.

Second, a standard quotation that Liebert would send to Level 3 describes 29 different components included with a purchase of a UPS system. One of these 29 components is a battery—its biggest component, in fact, representing just under half of the cost of a complete UPS system.

Finally, as one of Level 3's representatives testified, "the batteries and the UPS's are one in the same. . . . [T]hey're useless unless together." Aplt. App. 1126. Just as one does not expect to buy a car only to discover the battery is missing, one apparently does not buy UPS systems without batteries. Thus, when one buys a UPS system, one may be justified in assuming a battery accompanies the system.

-16-

All three items of extrinsic evidence, especially taken together, suggest the Agreement applies to batteries ordered as part of complete UPS systems.

In the face of this, Liebert categorically maintains that the Agreement unambiguously *excludes* UPS batteries. We disagree. Liebert starts with the canon of construction that "expression in a contract of one or more things of a class implies exclusion of all not expressed." *Elliot v. Joyce*, 889 P.2d 43, 46 (Colo. 1994). Because UPS systems are listed and batteries are not, Liebert argues, batteries are not Products. But this principle of interpreting written documents—*expressio unius est exclusio alterius*—does not support Liebert's argument. Far from being just one thing in the class of items that includes UPS systems and other similar products, batteries form an integral part of a UPS system. The batteries themselves are thus in a completely different class—the class of *components* constituting a complete UPS system. By mentioning UPS systems, the Agreement may be understood as implicitly mentioning all of the components. The *expressio unius* principle finds no application here.

Liebert further contends language elsewhere in the Agreement shows that UPS system batteries cannot be Products, as the term is defined in the Agreement. The Agreement, in addition to general warranties for all Products, describes limited warranties for UPS systems. By its terms, the limited warranty is void "if User allows any battery for the Liebert product to discharge below the minimum battery voltage cutoff point." Aplt. App. 97. To Liebert, this language leads to

an inescapable conclusion—batteries are something different than a "Liebert product." But to us, the quoted language—employing an undefined term "Liebert product" rather than the key defined term "Product"—does not support the conclusion that the Agreement unambiguously excludes batteries from the term Products. The quoted language is simply beside the point.

Accordingly, we reject Liebert's categorical argument that batteries, as a matter of law, are never Products. But in rejecting Liebert's argument, we do not mean to accept the opposite—that the batteries are unambiguously Products, to which the Agreement would apply. Rather, as the following discussion illustrates, the issue is ambiguous and must be decided by the jury.

*Temporary Replacement Batteries*

That batteries ordered and delivered in the ordinary course of business between Level 3 and Liebert may constitute Products under the Agreement does not resolve this case. What makes the issue in this case different from the ordinary course of the parties' business are the unusual circumstances surrounding the transaction. These circumstances underscore the relevant ambiguity in the Agreement.

Because of an unexpected delay in manufacturing batteries amidst the dot-com boom in 2000, Level 3 had to order two sets of batteries. The first set—the 15-minute batteries—was delayed. Level 3 then asked Liebert to locate batteries that could be delivered close to the original batteries' scheduled delivery date.

-18-

For the additional set, Level 3 even settled for six-minute batteries instead of its standard specification, which called for batteries with at least 15 minutes of ride-through time.

If the replacement batteries were meant as a permanent solution—completely displacing the original batteries and permanently installed together with the original order of UPS systems—then the extrinsic evidence we have already discussed might at least suggest the Agreement applied to the batteries. The case would be analogous to ordering a watch at a jewelry store to be ready in two days, only to find out two days later that the watch is not ready because the store has not received a battery meant to go with the watch. If a customer asks the store to forget the original battery and find a replacement that day (perhaps a battery with slightly different specifications), the customer may be justified in expecting the whole thing, including the replacement battery, to be new. The same applies to replacement UPS system batteries meant to become a permanent replacement.

But not so in the case of a temporary solution. To continue with the watch analogy, suppose the store tells the customer that the original battery, although delayed, is sure to arrive within a week. Meanwhile, the customer instead can have a temporary battery with less power installed, which the store will swap for the originally-intended battery in a week. This represents a temporary solution. In this circumstance, it no longer follows that the replacement battery ought to be

new.  All that the replacement battery is meant to do is enable the customer to enjoy the watch while waiting for the original battery to arrive.  The temporary replacement battery, for example, may have only half of its power left.  The customer may well not care, so long as the battery contains enough power to last until the original battery arrives.

The Agreement is ambiguous on whether batteries, intended as only a temporary solution, would constitute Products.  The parties' prior course of dealings does not shed any light on this question, and neither does the quotation sheet listing all of UPS systems' components, which obviously does not anticipate Level 3 having to purchase two sets of batteries.  Thus, the district court judge should have let the jury determine the meaning of the Agreement on this issue, with the parties introducing extrinsic evidence.

Like Liebert, although at the polar opposite end, Level 3 argues no ambiguity exists, and the Agreement clearly applies to any set of batteries Level 3 purchases from Liebert.  We are not persuaded.  First, Level 3 argues items need not actually be listed in the P&P Attachment to qualify as Products.  The Agreement contains a general provision, instructing that "[a]ll listings of items shall not be taken to be exclusive, but shall include other items, whether similar or dissimilar to those listed, as the context reasonably requires."  Aplt. App. 73.  Level 3 argues that context reasonably requires that any battery purchased from Liebert be considered a Product.

-20-

This argument fails because a more specific provision in the Agreement—the requirement that Products be described in the P&P Attachment—controls the effect of the general provision on which Level 3 relies. *See E-470*, 30 P.3d at 801. Moreover, as the relevant context that supposedly requires all batteries to be Products, Level 3 marshals the parties' course of prior dealings. But as we have already explained, that course of dealings does not address the unique situation in this case.

Second, Level 3 argues the six-minute batteries must be Products because they were purchased via a purchase order submitted to Liebert. To be sure, the Agreement does say that "[a]ll purchases of Products by [Level 3] shall be made by means of purchase orders." Aplt. App. 57. But we cannot logically infer the flip side—that all items ordered via a purchase order are necessarily Products.

Lastly, Level 3 argues that all items sold by Liebert to Level 3 are either Products, which the Agreement warrants to be new, or "third-party accessories," which under the Agreement receive only the warranty provided by the third party. Because UPS system batteries are not accessories, the argument goes, they must be Products.

We agree that UPS system batteries, constituting an essential component of a functioning UPS system, are not accessories, as the word is commonly understood. An item is an accessory only when it represents "a thing of secondary or subordinate importance[,] an object or device that is not essential in

itself but that adds to the beauty, convenience, or effectiveness of something else." *Webster's Third New International Dictionary* 11 (2002); *see also Black's Law Dictionary* 15 (8th ed. 2004) (defining "accessory" as "[s]omething of secondary or subordinate importance"). Rather than merely adding to the effectiveness of a UPS system, a battery is an essential component, without which there can be no effectiveness. To conclude otherwise would require a "strained construction[]" that in the absence of evidence showing the parties intended such a construction, "should be avoided." *Allstate*, 52 P.3d at 819.

But Level 3 is wrong to erect a false dichotomy between Products and third-party accessories, as if no other choices exist. Temporary replacement batteries may well be neither Products nor accessories; the parties, when they entered into the Agreement, may not have contemplated a situation needing a replacement solution ever to arise.

We therefore hold the Agreement does not unambiguously answer whether the six-minute batteries should be considered Products. On remand, this question becomes one of fact, to be answered by the jury.

### 3. Not a Harmless Error

We next turn to whether the erroneous jury instruction constitutes harmless error. We conclude it does not.

"Where an appellate court determines that the district court has given a legally erroneous jury instruction, the judgment must be reversed if the jury *might have* based its verdict on the erroneously given instruction." *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 867 (10th Cir. 2003) (quotations omitted, emphasis added); *see also Dillard & Sons Constr., Inc. v. Burnup & Sims Comtec, Inc.*, 51 F.3d 910, 916–17 (10th Cir. 1995) (noting we must reverse the judgment and remand the case for a new trial if "the jury 'might' have based its verdict on [an] erroneous instruction"). The "might have" threshold, as its language suggests, requires reversal "even if that possibility is *very unlikely*." *Wankier*, 353 F.3d at 867 (quotations and alterations omitted, emphasis added). Only "when the erroneous instruction could not have changed the result of the case" can we say the error is harmless and does not require reversal. *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1139 (10th Cir. 2006) (quotation omitted).

This inquiry is necessarily hypothetical. We do not know precisely how the jury would have resolved a case in the absence of an erroneous instruction. This is why the test is not whether the jury *did* base its verdict on an erroneous instruction, only whether it *might have* done so.

-23-

The jury awarded Level 3 the same amount of damages on its breach of contract, negligent misrepresentation, and fraudulent concealment claims. To determine whether the erroneous jury instruction might have affected the jury's verdict, we must analyze each claim separately. In other words, to conclude the error is not harmless, we must determine the error might have affected the jury's verdict on each of the three claims.

*Breach of Contract*

In instructing the jury the Agreement applied to the batteries at issue in this case, the district court virtually assured that the jury would find for Level 3 on the breach of contract claim. To prevail on that claim, Level 3 was required to prove (1) "the defendant entered into a contract with the plaintiff to supply batteries of a specified duration and quality and/or to indemnify the plaintiff against third-party claims based on the performance of those batteries," and (2) "the defendant . . . failed to supply batteries of a specified duration or quality, or it failed to indemnify the plaintiff against third-party claims." Aplt. App. 1532 (jury instructions). Because the parties did not dispute that Level 3 and Liebert did in fact sign the Agreement and that Liebert failed to supply new batteries or to indemnify Level 3 against a claim by Lehman Brothers, the district court's instruction effectively directed the jury to find that both of the above elements are satisfied.

-24-

Indeed, the only real dispute between the parties was (and remains) whether the six-minute batteries constituted Products, as the term is defined in the Agreement. The district court's instruction resolved this dispute in Level 3's favor. Accordingly, the jury might have based (indeed, very likely did base) its breach of contract verdict on the erroneous instruction.

*Negligent Misrepresentation*

To recover under the negligent misrepresentation theory, Level 3 had to prove (1) Liebert "gave false information to Level 3," (2) "in the course of their business," (3) "in a business transaction," (4) Liebert was "negligent in obtaining or communicating the information," (5) Liebert "gave the information with the intent that Level 3 would act in reliance or knowing that Level 3 would act in reliance on the information," (6) "Level 3 relied on the information," and (7) the reliance caused damages. *Id.* at 1541–42 (jury instructions). We agree with Liebert that the erroneous jury instruction might have affected the jury's resolution of at least three elements.

To prove Liebert had supplied false information to Level 3 in connection with the sale of the six-minute batteries, Level 3 relied exclusively on two pieces of evidence. First, Level 3 pointed to the September 27, 2000 email from Stillwell-Hansen's Driscoll to Level 3's Sirotka, in which Driscoll referred to the batteries at issue as "this new battery." *Id.* at 1620. But the email contained references to both the original order of 15-minute batteries and the suggested

solution for Level 3 to purchase six-minute batteries.  The phrase "new battery" could well mean one of at least two things—either Driscoll was describing the six-minute batteries as factory-fresh or he was simply referring to the *new* six-minute batteries as opposed to the *old* 15-minute batteries, using "new" to indicate which of the two sets of batteries he was describing.

Second, Level 3 highlighted one of its representative's testimony that Liebert "came up with a new 6-minute battery alternative." *Id.* at 1233.  The representative, likely relying on the same ambiguous usage of the word "new," said Driscoll had "stated [the six-minute batteries] were new." *Id.*

To find that Liebert gave Level 3 false information about the six-minute batteries, the jury must have interpreted Driscoll's reference to "this new battery" as stating that the six-minute batteries were in fact brand-new, factory-fresh.  This conclusion, however, was by no means obvious and required the jury to interpret the ambiguous statement in light of other evidence in the case.  Among other things the jury already knew was that the Agreement required the six-minute batteries to be new; they were so instructed by the judge.  Armed with this knowledge, they naturally inferred that Driscoll falsely misrepresented the batteries to be new.  The jury, therefore, might have based, at least partly, its conclusion that Liebert had supplied Level 3 with false information on the erroneous instruction.

Moreover, the jury's instruction that the six-minute batteries were Products under the Agreement—and thus had to be new—might have affected the jury's conclusion regarding two other elements: (1) Liebert's intent for Level 3 to rely on the false information and (2) Level 3's actual reliance. If, as the jury was instructed, the Agreement required the batteries to be new, then the jury's conclusion was unremarkable. Driscoll said "new," probably *intending* for Level 3 to believe the batteries fit the Agreement's specification. And Level 3 likely *relied* on the same statement because it was expecting the batteries to be new. All were easy findings for the jury to make.

Without the erroneous instruction, however, the findings would have been much harder to make. If the jury were free to conclude the Agreement did not apply to the batteries at issue in this case, then it would no longer necessarily follow that Driscoll's misrepresentation (assuming it was a misrepresentation) intended to induce Level 3 to act a certain way. Nor would it necessarily follow that Level 3 relied on the misrepresentation. If, in other words, the jury were to conclude the Agreement did not apply to batteries meant as only a temporary solution, the jury might not have imputed to Liebert the intent to cause reliance, or actual reliance to Level 3.

In sum, whether the jury believed the Agreement applied to the six-minute batteries might have guided its resolution of at least three elements of the

negligent misrepresentation claim. Because each element is necessary to prove the claim, the jury might have based its verdict on the erroneous instruction.

*Fraudulent Concealment*

To prevail on its fraudulent concealment claim, Level 3 had to prove the following elements: (1) Liebert "concealed a past or present fact" it had a duty to disclose, (2) "the fact was material," (3) Liebert "concealed the fact with the intent of creating a false impression in the mind of Level 3," (4) "intent that Level 3 take a course of action that it might not have taken if it knew the true facts," (5) "Level 3 took such action or decided not to act" relying on the concealed information, (6) the reliance was justified, and (7) the reliance caused damages. Aplt. App. 1539 (jury instructions).

Unlike the previous claim, which looks to what *was* communicated, this cause of action focuses on what Liebert *did not* disclose to Level 3. Specifically, Level 3 argued Driscoll should have disclosed that the batteries were not new, of which Driscoll was well aware. As with the negligent misrepresentation claim, however, the jury, free from the erroneous instruction, might have decided several elements in Liebert's favor.

The intent for Level 3 to rely and its actual reliance are similar to several elements of the negligent misrepresentation claim. For the reasons we have just discussed, the jury might have decided them in Liebert's favor had it not been instructed that the six-minute batteries were covered under the Agreement.

-28-

Liebert makes an even stronger case regarding the materiality element. Whether the batteries are Products under the Agreement speaks directly to what Level 3 could reasonably expect Liebert to disclose—which facts, in other words, were or were not material. If, as the jury was instructed, the Agreement covered the batteries at issue in this case, then the jury could easily infer that whether the batteries were new constituted a material fact, which Liebert had the duty to disclose. If, on the other hand, the jury were free to conclude the Agreement did not cover temporary replacement batteries, then the jury might well have reasoned the age of the batteries to be immaterial. All that may have mattered to Level 3 in the latter scenario was whether the batteries would last long enough to fill a delay in the delivery of the original, 15-minute batteries. The jury thus might have based its resolution of the materiality element on the erroneous instruction.

Likewise, the jury might have relied on the erroneous instruction to find that Liebert concealed a material fact intending to create a false impression—or, put differently, intending to mislead Level 3. If the six-minute batteries, like all Products under the Agreement, had to be new, then the jury could infer from Driscoll's failure to disclose the batteries' age Liebert's intent to mislead Level 3 into thinking the batteries were in fact new, in compliance with the Agreement's warranty provision. But if the Agreement did not apply to the batteries, then the jury might have concluded Driscoll's non-disclosure represented nothing more than an innocent omission of a fact not deemed relevant.

Finally, whether Level 3's reliance on the concealment was justifiable also relates to the inquiry into what the Agreement did and did not cover. When we posit the batteries were Products and must have been new under the Agreement, Level 3 could justifiably conclude they were in fact new, absent Liebert's warning to the contrary. If, however, we let the jury conclude the batteries were not covered under the Agreement, then the jury is free to conclude Level 3 simply assumed, without good reason, the batteries were new. Level 3's reliance on the concealment, in other words, might not have been justified. The jury might have found this element in Level 3's favor based on the erroneous instruction.

As with the negligent misrepresentation claim, all elements of fraudulent concealment must be found for Level 3 in order for it to prevail. That the jury might have based on the erroneous jury instruction its determination of several of the elements demonstrates the error might have affected the jury's verdict on this claim.

\* \* \*

In sum, the district court erred in instructing the jury the batteries at issue in this case were Products under the Agreement. The jury must have been allowed to construe the Agreement, ambiguous on this question, for itself. And because the jury might have based on the erroneous instruction its verdict in favor of Level 3 on all claims, the error is not harmless and requires a remand.

**B. Other Issues**

-30-

Liebert also argues (1) the economic loss rule precludes the negligent misrepresentation claim, (2) no duty to disclose the six-minute batteries' age existed to support the fraudulent concealment claim, and (3) the punitive damages award was improper. We disagree with the first two arguments and, in light of the remand for retrial, need not reach the third.

### 1. Negligent Misrepresentation: The Economic Loss Rule

Whether the economic loss rule applies to bar Level 3's negligent misrepresentation claim "is an issue of law that we review *de novo*." *Colo. Visionary Academy v. Medtronic, Inc.*, 397 F.3d 867, 870 (10th Cir. 2005).

"Broadly speaking, the economic loss rule is intended to maintain the boundary between contract law and tort law." *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1259 (Colo. 2000); *see generally id.* at 1259–64 (describing in detail the rule's origins). Accordingly, under Colorado law, the "proper focus in an analysis under the economic loss rule is on the source of the duties alleged to have been breached." *Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267, 1269 (Colo. 2000). Boiled down, the rule prohibits "a party suffering only economic loss from the breach of an express or implied contractual duty [to] assert a tort claim for such a breach *absent an independent duty of care under tort law*." *Id.* (emphasis added). An independent duty of care under tort law thus serves as the boundary between contract and tort law, permitting only those tort claims that

-31-

allege such a duty has been breached.  *See A.C. Excavating v. Yacht Club II Homeowners Ass'n, Inc.*, 114 P.3d 862, 865–66 (Colo. 2005).

Explaining the demarcation between the two legal concepts in more detail, the Colorado Supreme Court has said, "[t]ort obligations generally arise from duties imposed by law . . . without regard to any agreement or contract." *Town of Alma*, 10 P.3d at 1262.  Contract obligations, on the other hand, "arise from promises made between parties [to] allocate risks and costs during bargaining." *Id.*  Demanding that an independent duty of care exist before a plaintiff can recover under tort law, the economic loss doctrine "serves to encourage parties to confidently allocate risks and costs during their bargaining without fear that unanticipated liability may arise in the future, effectively negating the parties' efforts to build these cost considerations into the contract." *Id.*  Absent an independent duty under tort law, the parties are held to the terms of their bargain.

Liebert argues Level 3, in asserting the negligent misrepresentation claim, is simply restating its breach of contract claim and thus should not be able to recover under tort law.  Under Colorado law, however, the tort of negligent misrepresentation is "based 'not on principles of contractual obligation but on principles of duty and reasonable conduct.'" *Id.* at 1263 (quoting *Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 73 (Colo. 1991)).

Level 3 alleged Liebert, independently of the Agreement, breached its duty of care in communicating information when it supplied purportedly false

-32-

information to Level 3 in the course of a business transaction. A breach of this duty is precisely what the tort of negligent misrepresentation seeks to address. *Keller*, 819 P.2d at 71 (explaining the duty underlying the negligent misrepresentation tort as a duty "to exercise reasonable care or competence in obtaining or communicating the information" (quoting Restatement (Second) of Torts § 552(1) (1965)); *see also Medtronic*, 397 F.3d at 870 (recognizing Colorado's adoption of section 552 of the Restatement). The district court thus correctly allowed Level 3 to argue its negligent misrepresentation claim to the jury.

Liebert instead argues the district court should have applied the economic loss rule to dismiss Level 3's negligent misrepresentation claim. Liebert relies on *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66 (Colo. 2004), but that case is not helpful to the cause. In *BRW*, the parties' contract "required [BRW] to inspect the [painting] plans and specifications with care, skill, and diligence." *Id.* at 75. "If any work was not in conformance with the contract documents, BRW was required to make a 'verbal report of such nonconformance' followed by a written report." *Id.* Because the contract explicitly described one party's duty to communicate certain information to the other, the economic loss rule barred the negligent misrepresentation claim. *Id.* In other words, the duty of care in communicating information—on which the negligent misrepresentation tort is based—did not exist *independently* of the parties' contractual obligations in *BRW*.

-33-

That is not the case here. Liebert's alleged misrepresentation was not a statement made in fulfilling a specific duty under the contract. Rather, it was made in the course of conversations to modify Level 3's purchase order—substituting (at least temporarily) six-minute batteries for the 15-minute batteries that could not be promptly delivered. In this context, the alleged misrepresentation is analogous to a misrepresentation that induces another party to enter into a contract. *See Medtronic*, 397 F.3d at 874 (concluding that under Colorado law, "the tort of negligent misrepresentation can arise from ordinary, arm's length bargaining that was expected to lead to a contractual relationship"). Thus, if as Level 3 alleges, Liebert communicated false information to Level 3 regarding the batteries' age, the jury could conclude Liebert breached a tort law duty that existed independently of the Agreement.

To fit this case under *BRW*, Liebert argues "Colorado recognizes no independent duty to make accurate statements describing commercial goods like batteries." Aplt. Br. 44. But Colorado tort law, whatever else it may or may not require by way of accuracy in describing commercial goods, clearly imposes a duty of "reasonable care or competence in obtaining or communicating the information." Restatement § 552(1). If the jury concludes Liebert breached this duty by purportedly supplying false information to Level 3—representing the batteries to be new when they in fact were not—the resultant negligent misrepresentation claim is cognizable under Colorado tort law.

-34-

We conclude the district court properly allowed Level 3's negligent misrepresentation claim to go to the jury, and the same result should apply on remand. The conclusion is strengthened by the fact that, at least on Liebert's interpretation of the Agreement, the sale of the six-minute batteries laid outside its scope, and the parties were merely negotiating a new contract, rather than operating under the existing one. For all of the above reasons, Level 3's negligent misrepresentation claim is not barred by the economic loss rule.

### 2. Fraudulent Concealment: Duty to Disclose

Liebert also argues the fraudulent concealment claim should have been dismissed because Liebert had no duty to disclose to Level 3 the six-minute batteries were not new. "The question of whether a duty exists is a question of law," which we review de novo. *Shute v. Moon Lake Elec. Ass'n, Inc.*, 899 F.2d 999, 1001 (10th Cir. 1990).

"To succeed on a claim for fraudulent concealment or non-disclosure, a plaintiff must show that the defendant had a duty to disclose material information." *Mallon Oil Co. v. Bowen/Edwards Assocs., Inc.*, 965 P.2d 105, 111 (Colo. 1998). Such a duty exists "to disclose . . . material facts that in equity or good conscience should be disclosed." *Poly Trucking, Inc. v. Concentra Health Servs., Inc.*, 93 P.3d 561, 564 (Colo. Ct. App. 2004) (citing *Mallon Oil*, 965 P.2d at 111). To determine which facts a person in equity or good conscience must disclose, Colorado courts look to the Restatement for guidance.

-35-

Section 551(2)(b) of the Restatement controls the outcome in this case. It reads, "One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated[] matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading." Restatement § 551(2)(b). As explained in the comments, a statement may be misleading when "made so ambiguously that it may have two interpretations, one of which is false." *Id.* cmt. g. "When such a statement has been made, there is a duty to disclose the additional information necessary to prevent it from misleading the recipient." *Id.*

It is undisputed Driscoll on at least one occasion referred to the six-minute batteries as "new." As we have already explained, this reference is ambiguous in that it can be understood to represent one of at least two things: (1) that the batteries are brand-new, or (2) that the batteries are new only insofar as they are not the same as the old order of 15-minute batteries. In other words, the former describes the batteries' age, while the latter merely places the two orders of batteries on a time line. And there may well be other interpretations, but of the two examples, only the latter is true; the former is demonstrably false, as Driscoll knew. Thus, the jury could conclude that Liebert, under a duty to correct a misleading statement, had to disclose the batteries were not new.

In response, Liebert argues "Driscoll made no partial or ambiguous statement of the facts" to trigger a duty under Section 551(2)(b). Rply. Br. 26. In

making this argument, Liebert is presumably contending the "new" reference unambiguously describes a different order of batteries, but not their age. While Liebert's construction is reasonable, it is by no means obvious or unambiguous. And Liebert cannot avoid the ambiguity by simply selecting one interpretation and pretending away the other.

Liebert also relies on two Colorado state court decisions, arguing they demonstrate a party to a contract does not have a duty to disclose matters not covered by the contract. *See Poly Trucking*, 93 P.3d at 561; *Xerox Corp. v. ISC Corp.*, 632 P.2d 618 (Colo. Ct. App. 1981). This argument suffers from two flaws. First, unlike the contracts in those cases, the Agreement, though ambiguous, may be construed to apply to the batteries at issue in this case. If so, then Liebert's non-disclosure would relate to matters well within the scope of the Agreement. And second, neither *Poly Trucking* nor *Xerox* involved situations where a defendant triggered the duty to disclose by making an ambiguous statement capable of misleading. But under Level 3's theory of the case, the jury could conclude Liebert has made just such a statement, thus triggering its duty to disclose.

Accordingly, Level 3's fraudulent concealment claim properly relies on Liebert's duty to disclose the batteries' age and condition.

### 3. *Punitive Damages on the Fraud Claim*

In light of the remand for new trial, we need not address Liebert's challenge to the jury's punitive damages award. "Circuit courts have considerable discretion concerning the scope of a remand." *Heno v. Sprint/United Management Co.*, 208 F.3d 847, 859 (10th Cir. 2000). As in *Heno*, "because we are remanding the compensatory portion of the case," the parties "may adduce additional or different evidence," *id.*, which obviates our need to consider Liebert's challenge to the punitive damages award.

On remand, Level 3 and Liebert will present additional evidence to convince the jury the Agreement should be construed one way or another. In light of the potentially new evidence, we should not now speculate how the new jury will resolve Level 3's request for punitive damages.

\* \* \*

The district court erred in concluding the Agreement unambiguously applied to the batteries at issue in this case. The instruction might have affected the jury's resolution of Level 3's breach of contract, negligent misrepresentation, and fraudulent concealment claims. But the district court correctly allowed Level 3's tort claims to go to the jury. The same three claims should thus be retried on remand.

-38-

## III.  Conclusion

For the foregoing reasons, we VACATE the jury's verdict for Level 3 on breach of contract, fraudulent concealment (including punitive damages), and negligent misrepresentation claims and REVERSE and REMAND for new trial.