*IT Portfolio Inc. v. Facsimile Commc'ns Indus., Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1.   WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER").   A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 26th day of October, two thousand twenty.

PRESENT:
> REENA RAGGI,
> RICHARD J. SULLIVAN,
> JOSEPH F. BIANCO,
> > *Circuit Judges.*

_____

IT Portfolio Inc., a Colorado Corporation,

> *Plaintiff-Appellant*,

> v.                                                                          No. 20-1155

Facsimile Communications Industries, Inc.,
a Delaware Corporation, Atlantic
Technology Integrators, LLC, a Delaware
Limited Liability Company,

> *Defendants-Appellees.*

_____

**For Appellant:**                    ROBERT C. PODOLL (Marisa Rauchway Sverdlov, Law Office of Marisa Rauchway Sverdlov, West Caldwell, NJ, *on the brief*), Podoll & Podoll, P.C., Greenwood Village, CO.

**For Appellees:**                    BARRY S. KANTROWITZ (Reginald H. Rutishauser, *on the brief*), Kantrowitz, Goldhamer & Graifman P.C., Chestnut Ridge, NY.

Appeal from the United States District Court for the Southern District of New York (George B. Daniels, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the district court's judgment is **AFFIRMED**.

Plaintiff IT Portfolio, Inc. ("ITP") appeals from a judgment of the district court (Daniels, *J.*), dismissing its complaint for failure to state a claim, as well as from the district court's subsequent order refusing to alter or amend that judgment. ITP sued Facsimile Communications Industries, Inc. and Atlantic Technology Integrators, LLC (together with Facsimile, the "Buyers") based on a software development and assignment agreement that ITP had entered into with

another company, NER Data Products, Inc. Under that contract, ITP transferred the rights to software it had helped develop, Print4, and agreed to continue developing and servicing that software in the future, in exchange for certain ongoing payments. Eventually, NER stopped meeting its payment obligations, and ITP sued NER in Colorado federal court. Nine months later, while the Colorado action was still pending, NER sold its rights to the Print4 software to Atlantic Technology, which ITP alleges "was acting as a strawman for Facsimile." J. App'x at 4. ITP then sued both Buyers, alleging that under the contract between ITP and NER, any third-party purchaser of the Print4 software was obligated to pay ITP ongoing payments similar to those required of NER. ITP also asserted alternative claims for breach of implied contract and unjust enrichment.

The district court dismissed ITP's complaint, holding that ITP had terminated its contract with NER prior to NER selling the Print4 software to the Buyers. As a result, the district court reasoned that the Buyers had purchased Print4 free and clear of any contractual (or quasi-contractual) obligations that might have followed the software had ITP not terminated its agreement with NER. The district court later denied ITP's request to alter or amend its judgment under Federal Rule of Civil Procedure 59(e).

3

We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal.

### *Standard of Review*

We review *de novo* a district court's decision to dismiss a complaint under Rule 12(b)(6). *See Yamashita v. Scholastic Inc.*, 936 F.3d 98, 103 (2d Cir. 2019). "[A] district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016). In this case, given the contract's choice-of-law provision, that issue is governed by Colorado law. Under Colorado law, "[d]etermining whether a written contract is ambiguous is a question of law." *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1155 (10th Cir. 2008) (internal quotation marks omitted). To make that assessment, we must examine the instrument's language and, unless the parties indicated a contrary intent, construe that language "in harmony with the plain and generally accepted meaning of the words used." *Id.* at 1154 (internal quotation marks omitted). Where the contract "unambiguously resolves the parties' dispute, [our] task is over." *Id.*

While we technically review a denial of a Rule 59(e) motion for abuse of discretion, *see Padilla v. Maersk Line, Ltd.*, 721 F.3d 77, 83 (2d Cir. 2013), no separate

4

analysis is needed here. A court abuses its discretion when its decision rests on an error of law or a clearly erroneous factual finding, *see id.*, so our *de novo* review of the district court's decision to dismiss the case will decide both whether the judgment was entered in error and whether the district court abused its discretion in refusing to alter or amend that judgment.

*Discussion*

## A. Breach of Contract

Whether ITP has stated a claim for breach of contract against the Buyers requires us to answer two questions. First, we must decide whether ITP terminated the agreement following NER's alleged breach, or whether it merely discontinued the development services it provided under the contract while leaving the contract itself intact. Second, depending on the answer to that first question, we must determine what effect (if any) ITP's actions had on the obligations of a future third-party buyer of the Print4 software.

"[O]n December 1, 2014, ITP declared a breach of the [contract] and notified NER that [it] was electing to exercise the termination of services and damage remedies in accordance with Section 11.1 of the Software Agreement." J. App'x at 4. According to ITP, it did not actually terminate the entire agreement on this

5

date, but instead simply discontinued certain development services it provided to NER under the contract. But that begs the question of whether there is a difference between termination of the agreement and discontinuation of those development services.

Section 11.1 of the contract provides:

> This Agreement may be terminated by the non-defaulting party if . . . a party materially fails to perform or comply with this Agreement or any provision hereof . . . .

> With one hundred twenty days (120) notice, ITP may voluntarily discontinue Development Services under this Agreement. After such notice period, ITP shall be relieved of all obligations to perform Development Services.

*Id.* at 23. While it could be argued that Section 11.1 by itself is ambiguous as to whether termination by default and voluntary discontinuance are distinct events, the very next section of the contract clarifies that these are simply two different methods for terminating the contract.

Specifically, Section 11.2 indicates that termination may occur as a result of either a default or a voluntary discontinuation of development services by ITP:

> On the effective date of termination due to a default *or* voluntary discontinuation by ITP, all obligations to perform Development Services shall expire. . . . ITP

6

shall have no right of acceleration if the agreement is terminated due to ITP's default *or* ITP's voluntary discontinuation . . . .

*Id.* (emphasis added). ITP's assertion that its voluntary discontinuation of services was not a termination event is impossible to square with this language, which clearly treats a voluntary discontinuation as merely one means of terminating the agreement. By its plain terms, the contract provides both a fault-based termination trigger that may be exercised by the non-breaching party (whichever entity that happens to be), and a no-fault termination trigger that is exercisable only by ITP.

ITP's separate contention that the use of "termination" in Section 11.2 cannot mean a termination of the agreement because the provision contemplates continuing payment obligations between the parties has even less merit. That argument presumes that contracts cannot provide for post-termination obligations between parties, which is plainly incorrect. Indeed, Section 7.4 of the contract provides a heartland example of such a provision when it specifies that certain confidentiality and non-compete restrictions "will survive the termination of this Agreement." *Id.* at 20. Provisions of this sort are commonplace and certainly do

7

not imply that the parties are powerless to terminate agreements until the last obligation is met.

We therefore conclude that ITP terminated the software agreement on December 1, 2014 (or, at the very least, 120 days thereafter), when it announced that it would cease providing development services following NER's alleged breach. By the express terms of Section 11.2, NER was then obligated for another 42 months of payments to ITP, calculated as a percentage of NER's average sales of the Print4 software over the 12 months preceding termination:

> [Following the effective date of termination,] NER shall continue to be responsible to pay ITP one half percent (.5%) less than the percentage currently being paid to ITP based on Adjusted Gross Sales for three and a half (3.5) years after the expiration of the notice period ("the continuing payments"). For purposes of calculating the foregoing, the average of Adjusted Gross Sales in the most recent 12 months will be used as the monthly Adjusted Gross Sales.

*Id.* at 23. But what about the Buyers, which did not purchase the rights to the Print4 software from NER until ten months later?

During the life of the contract, NER had significant freedom to sell its rights to the Print4 software to any third-party buyer of its choosing. In fact, the contract made clear that NER could "sell or assign its rights under th[e] Agreement and the

8

Print4 Software without the prior consent of ITP."  *Id.* at 22.   ITP's only rights in connection with such a sale are found in Sections 10.2 and 10.3 of the contract. Those rights are limited to receiving advance notice of the sale and an option to terminate the software agreement following the sale, in exchange for receiving 42 months of payments from the third-party buyer (similar to the payments that ITP would be owed from NER under Section 11.2 following a termination without a sale).

It is that right to receive payments from a third-party purchaser that ITP now seeks to invoke against the Buyers.  But there's a problem with that position:  neither Section 10.3 nor any other provision of the contract states that ITP's right to demand payments from a buyer survived termination.  In fact, Section 10.3 expressly contemplates that the contract must still be in existence at the time of the sale for ITP to demand such payments.   After all, the payment right is triggered by ITP's termination of the contract, something ITP clearly could not do if the contract had already been terminated:

> If there is a Sale event, . . . ITP shall have the option exercisable by written notice . . . to NER and to Buyer no later than sixty (60) days after the Sale, [to] elect to terminate this Agreement in exchange for [certain payments from] the Buyer . . . .

9

*Id.*

To get around the language of Section 10.3, ITP puts forward two arguments, neither of which has merit. First, ITP points out that under Sections 7.3 and 7.4, the parties had the right to enjoin an "unauthorized use, transfer or disclosure of the Print4 Software," which survived termination. *Id.* at 20. But, as just discussed, ITP never had the ability to enjoin NER from transferring its rights to the Print4 software; all it could do was demand notice of a potential transfer and terminate the agreement after the sale was completed. So nothing in Article 7 preserves ITP's right to receive payments from a buyer who acquired the software *after* termination.

Second, ITP makes a plea to commercial sensibilities, arguing that a reading of the contract that would prevent it from demanding payment from a post-termination buyer makes no sense, as it would deprive ITP of the fruits of its labors on Print4. But that argument is misplaced. Following termination, any right that ITP had to ongoing payments under the contract became *NER's* obligation under Section 11.2. So our conclusion that the Buyers are not liable to ITP under the contract does not mean that ITP is without recourse; it simply means that ITP must recover whatever it is owed from its contractual counterparty, NER. And,

in fact, ITP is currently attempting to do just that, as its suit against NER in Colorado is still pending.

In short, ITP's decision to cease development services caused its contract with NER to terminate. At that point, NER became liable to ITP for 42 months of continuing payments calculated as a percentage of NER's average monthly sales of the Print4 software over the preceding year. But that was the extent of the parties' relationship going forward. Among other things, that meant that NER could sell the Print4 software to a third-party buyer without ITP having the right to collect additional payments from that buyer. We therefore agree with the district court's decision to dismiss each of ITP's breach of contract claims.

## B.    Breach of Implied Contract & Unjust Enrichment

Having determined that ITP has no breach of contract claim against the Buyers, we are able to easily dispose of ITP's remaining claims. Under Colorado law, there can be no claim for implied contract or unjust enrichment if the subject matter of those claims is governed by an express contract between the parties. *See Pulte Home Corp. v. Countryside Cmty. Ass'n, Inc.*, 382 P.3d 821, 833 (Colo. 2016) (unjust enrichment); *Specialized Grading Enters., Inc. v. Goodland Constr., Inc.*, 181 P.3d 352, 354 (Colo. App. 2007) (implied contract). Other than where the express

contract is determined to have been defective or is otherwise rescinded, the only exception is if the relevant conduct both occurred after the execution of the contract and was not covered by the terms of that contract.

Here, the district court properly dismissed ITP's claims for breach of an implied contract and unjust enrichment. In pleading both claims, ITP relies on the fact that the software agreement between ITP and NER contained a clause obligating third-party buyers to pay ITP 42 months of payments – a provision that the Buyers were aware of when they purchased the software from NER. But ITP's reliance on the express terms of the software agreement undermines its quasi-contract claims. According to the clear terms of the software agreement, ITP could demand 42 months of payments from a buyer who acquired the software *before* termination (Article 10) or 42 months of continuing payments from NER *after* termination (Article 11), but not both. Since the software agreement expressly foreclosed the possibility of recovery against a third-party buyer in the event of a post-termination sale by NER, the district court properly concluded that the subject matter of ITP's implied contract and unjust enrichment claims was governed by the express contract between ITP and NER.

12

*Conclusion*

We have considered all of ITP's remaining arguments and find them to be

without merit.    Accordingly, we **AFFIRM** the district court's judgment.

> FOR THE COURT:
> Catherine O'Hagan Wolfe, Clerk of Court