FILED
United States Court of Appeals
Tenth Circuit

May 6, 2014

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

VON J. PHATHONG; JENNIFER D.
PHATHONG,

      Plaintiffs - Appellees,

v.

TESCO CORPORATION (US),

      Defendant - Appellant.

No. 12-1455
(D.C. No. 1:10-CV-00780-WJM-MJW)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **MURPHY**, and **BACHARACH**, Circuit Judges.

## I. INTRODUCTION

Von J. Phathong was seriously injured while working on a drilling rig in

Garfield County, Colorado.  Phathong sued Tesco Corporation ("Tesco"), the

operator of the drilling rig, alleging a Colorado state-law claim for negligence.[1]

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

[1]Phathong's wife, Jennifer Phathong, brought a claim for loss of consortium
in the same complaint.  In Colorado, "[l]oss of consortium is a derivative claim.
Derivative claims are unique in that they depend entirely upon the right of the

(continued...)

Prior to trial, Tesco sought summary judgment on the ground it was immune from common-law negligence liability because, inter alia, it was Phathong's statutory employer under the provisions of Colorado's Workers' Compensation Act. *See* Colo. Rev. Stat. § 8-41-401. The district court denied Tesco's motion, concluding the existence of disputed issues of material fact precluded summary judgment. The matter proceeded to trial. After the parties rested their cases, but before the matter was submitted to the jury, the district court, on its own motion, granted judgment as a matter or law to Phathong on the question of immunity. In so doing, it concluded "the only reasonable interpretation of the evidence in this case is that [Tesco] is not a statutory employer" under § 8-41-401. The district court thereafter submitted Phathong's negligence claim to the jury; the jury found in Phathong's favor and granted him a substantial award of damages.[2] Tesco appeals, raising multiple challenges to both the district court's legal rulings and the jury's award of damages. This court concludes the record conclusively demonstrates Tesco was Phathong's statutory employer and, therefore, immune

---

[1](...continued)
injured person to recover." *Colo. Comp. Ins. Auth. v. Jorgensen*, 992 P.2d 1156, 1164 (Colo. 2000) (citation omitted). "The effect of being a derivative claim is that loss of consortium claims are subject to the same defenses available to the underlying personal injury claim." *Id.* at 1164 n.6. Accordingly, the analysis set out in this opinion as to Phathong's negligence claim applies equally to Jennifer Phathong's claim for loss of consortium.

[2]The jury likewise found in favor of Jennifer Phathong on her loss-of-consortium claim and awarded her $75,000 in damages.

from Phathong's negligence claims. This ruling obviates the need to address any of the other issues raised by Tesco on appeal. Accordingly, exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **remands** this case to the district court to vacate its judgment in favor of the Phathongs and, instead, enter judgment in favor of Tesco.

## II. BACKGROUND

### A. Factual Background

Phathong began working for Tesco as a "floor hand" on a particular drilling rig, the DTC2 rig, in October of 2005. At 3:30 a.m. on the morning of December 13, 2005,[3] Phathong was seriously injured while working on DTC2. For purposes of resolving this appeal, it is unnecessary to set out the facts surrounding Phathong's injury. Instead, it is sufficient to note the jury found Tesco's negligence in the operation of DTC2 was ninety-percent responsible for Phathong's injuries and awarded him a substantial amount of damages.

Tesco develops, manufactures, and services oil and gas rigs. As part of its normal business practices, Tesco would, at the time of the events at issue in this case, sign drilling contracts with owners of natural gas wells to provide drilling services, including the provision of drilling rigs and the personnel necessary to operate those rigs (the "casing drilling services business"). In April 2003, Tesco

---

[3]As will quickly become apparent, the date and time of this accident plays a critical part in this appeal.

entered into a Master Service Agreement with EnCana Oil & Gas (USA), Inc. ("EnCana"). This Master Service Agreement governed all subsequent contracts between Tesco and EnCana. Thereafter, in June 2005, Tesco and EnCana entered into a drilling contract (the "EnCana Drilling Contract") covering Tesco's natural gas casing drilling services operations on behalf of EnCana in Garfield County, Colorado. The EnCana Drilling Contract obligated Tesco, as the driller, to furnish all equipment, labor, and services necessary to dig wells to the depth of no less than 9500 feet, and no more than 10,000 feet. In particular, it mandated that Tesco use DTC2, a drilling rig leased by Tesco from Drillers Technology Corporation, for all work covered by the contract. The EnCana Drilling Contract also made Tesco responsible for making sure work on the rig was performed safely and obligated Tesco to carry adequate workers' compensation insurance.

During the summer of 2005 (i.e., before Phathong was hired by Tesco and before the accident giving rise to Phathong's injuries), Tesco entered into negotiations to sell the casing drilling services portion of its business to Turnkey E&P Corporation ("Turnkey"). At approximately 7:30 a.m. on the morning of December 13, 2005, Tesco and Turnkey closed on their Revised and Restated Acquisition Agreement (the "Acquisition Agreement") and related Rig Personnel Supply Agreement (the "Rig Personnel Agreement"). Pursuant to the terms of the Acquisition Agreement, the deal became effective at 12:01 a.m. on the closing date (i.e., 12:01 a.m. on December 13, 2005, which is approximately three and

one-half hours before the accident giving rise to Phathong's injuries).[4] Turnkey acquired only the casing drilling services division of Tesco and, after the sale, Tesco remained in business. Specifically, Turnkey acquired four Tesco-owned drilling rigs and the drilling contracts associated with those rigs. Turnkey also acquired all employees who worked in Tesco's casing drilling services division, including Phathong and the other DTC2 crew members.[5] Importantly, however, Turnkey did not acquire the Master Service Agreement or EnCana Drilling Contract. Nor did Turnkey acquire Tesco's lease of DTC2 or of the other two rigs Tesco leased from Drillers Technology Corporation. Thus, as of 12:01 a.m. on December 13, 2005, Tesco remained obligated to perform under its remaining

---

[4]This provision of the Acquisition Agreement underpins Phathong's arguments regarding the unavailability of immunity to Tesco under Colorado's Workers' Compensation Act. That is, if the agreement had become effective upon closing, rather than at 12:01 a.m. on the day of closing, there would be no doubt but that Tesco was Phathong's actual employer at the time of the accident and, thus, entitled to immunity under the provisions of Colorado's Workers' Compensation Act. Because Tesco does not raise the argument on appeal, and because the record makes clear Tesco was Phathong's statutory employer, this court need not address whether the arbitrary time frame for assigning corporate liabilities in the contract between Tesco and Turnkey served to strip Tesco of its status as an actual employer under Colorado law. *See infra* n.5.

[5]The Acquisition Agreement provided that Tesco would be responsible for all "liability, costs[,] and expenses" for employment claims, including workers' compensation claims, "any employment-related tort claim," or "other claims or charges of or by" a former Tesco employee that accrued prior to the effective time of the agreement. Likewise, the agreement provided Turnkey would be responsible for the same accruing after the effective time.

contracts with, inter alia, EnCana and its drilling rig leases with Drillers Technology Corporation.

To fulfil its contractual obligations to EnCana and others, Tesco entered into the Rig Personnel Agreement with Turnkey. The Rig Personnel Agreement first recited that Tesco (1) remained contractually obligated to perform under its agreements with EnCana and others, (2) continued to hold leases on drilling rigs owned by Drillers Technology Corporation, but (3) lacked the manpower to manage the rigs because of the sale of its casing drilling services business to Turnkey. In light of these facts, the parties agreed that "while [Tesco] provides services to its third party customers, [Turnkey] shall provide personnel services with respect to the" leased rigs. Tesco paid Turnkey every two weeks pursuant to the following formula: "[Turnkey] will be compensated for the Services at the rate of one hundred and fifteen percent (115%) of the total of the actual and reasonably documented costs to [Turnkey] of salary and employment benefits and related [workers'] compensation paid to (or on behalf of) those individual employees of [Turnkey] who provide Services to [Tesco] under this Agreement . . . ."[6] The Rig Personnel Agreement imposed upon Tesco the

_____

[6]This billing arrangement stands in stark contrast to the billing arrangement Turnkey and Tesco reached as to drilling contracts assigned to Turnkey under the Acquisition Agreement. As to the assigned contracts, the Acquisition Agreement obligated Tesco to use its best efforts to secure consent from all its customers to the assignments. Until such consent was secured, Tesco was obligated to

(continued...)

-6-

responsibility for designating to Turnkey the drilling locations for the rigs, the drilling schedule, and providing a safe workplace environment for the performance of the services under the agreement. Turnkey was responsible for ensuring its personnel acted in a "commercially reasonable, industry standard manner and endeavor in good faith to perform its responsibilities . . . with operational expertise" in accordance with Tesco's direction, unless Turnkey "reasonably believes that such directions will cause the well to be drilled in an imprudent or unsafe manner, in which case [Turnkey] shall have the right to refuse to conduct the requested operation." Finally, the Rig Personnel Agreement defined the relationship of the parties as "independent contractor[s]," with neither party "deemed for any purpose to be, the agent, servant[,] or representative" of the other party.

## B. Procedural Background

The Phathongs filed suit against Tesco in the United States District Court for the District of Colorado claiming, inter alia, that Tesco's negligence in operating the DTC2 drilling rig led to their injuries. Tesco eventually filed a motion for summary judgment, asserting the Phathongs' common-law damages claims were barred by, inter alia, the immunity afforded to statutory employers by

---

[6](...continued)
continue invoicing customers for all services performed by Turnkey and to remit any payments it received to Turnkey. Ultimately, however, Tesco was not liable to Turnkey for any amounts a customer refused to pay on an invoice.

the Colorado Workers' Compensation Act. *See* Colo. Rev. Stat. § 8-41-401. The district court denied Tesco's motion and the case proceeded to trial. Prior to submission of the case to the jury, the district court sua sponte granted judgment as a matter or law to Phathong on the question of Tesco's entitlement to immunity as a statutory employer. In so doing, it concluded "the only reasonable interpretation of the evidence in this case is that [Tesco] is not a statutory employer" under § 8-41-401. In that regard, the district court reasoned as follows:

> The relationship [between Tesco] and Turnkey pursuant to that sale was not one of a general contractor and subcontractor . . . as envisioned by the Colorado Supreme Court in [*Finlay v. Storage Technology Corp.*, 764 P.2d 62 (Colo. 1988)]. This was a sale of drilling operations, such that EnCana remained a general contractor, and Turnkey took over the subcontractor duties of running the drilling operations.
>
> In these circumstances, [Tesco] is not the "statutory employer" entitled to immunity under the Colorado Workers' Compensation Act.

## III. ANALYSIS

### A. Legal Background

"The primary purpose of [Colorado's] workers' compensation act is to provide a remedy for job-related injuries, without regard to fault. The statutory scheme grants an injured employee compensation from the employer without regard to negligence and, in return, the responsible employer is granted immunity from common-law negligence liability." *Finlay*, 764 P.2d at 63 (citations

-8-

omitted).  "Although a given company might not be [an injured party's] employer as understood in the ordinary nomenclature of the common law, it nevertheless might be a statutory employer for workers' compensation coverage and immunity purposes."  *Id.* at 64.  The term "statutory employer" is defined in Colorado's Workers' Compensation Act as follows:

> Any person, company, or corporation operating or engaged in or conducting any business by leasing or contracting out any part or all of the work thereof to any lessee, sublessee, contractor, or subcontractor, irrespective of the number of employees engaged in such work, shall be construed to be an employer as defined in articles 40 to 47 of this title and shall be liable as provided in said articles to pay compensation for injury or death resulting therefrom to said lessees, sublessees, contractors, and subcontractors and their employees or employees' dependents . . . .

Colo. Rev. Stat. § 8-41-401(1)(a)(I).  Section 8-41-401(1)'s "purpose is to prevent employers from avoiding responsibility under the workers' compensation act by contracting out their regular work to uninsured independent contractors."  *Finlay*, 764 P.2d at 64.[7]  Thus, § 8-41-401(1) "makes general contractors ultimately responsible for injuries to employees of subcontractors."  *Id.*  Along with this burden comes a corresponding benefit.  Under the Colorado scheme, "[s]tatutory immunity goes hand in hand with statutory liability."  *Buzard v. Super Walls,*

---

[7]In *Finlay*, the Colorado Supreme Court was considering a predecessor version of the "statutory employer" provisions of the Workers' Compensation Act, specifically Colo. Rev. Stat. § 8-48-101(1) (1986).  *Finlay v. Storage Tech. Corp.*, 764 P.2d 62, 64 (Colo. 1988).  For all purposes relevant to this appeal, the current version of the Workers' Compensation Act is identical to the version at issue in *Finlay*.

*Inc.*, 681 P.2d 520, 523 (Colo. 1984). To qualify for the immunity afforded a statutory employer, § 8-41-401(1) imposes an obligation on general contractors to carry workers' compensation insurance. *Id.* at 522.

Section 8-41-401(1) does not permit injured employees to obtain a double recovery. *Finlay*, 764 P.2d at 64. Instead, under Colorado's Workers' Compensation Act, "if a subcontractor has obtained insurance[,] its employee cannot reach upstream to the general contractor to establish tort liability; the general contractor is immune from suit as any insured employer would be." *Id.* (quotations and alterations omitted). This aspect of Colorado law "encourages those contracting out work to require that contractors and subcontractors obtain workers' compensation insurance."[8] *Buzard*, 681 P.2d at 523.

---

[8]It is undisputed Tesco and Turnkey both carried workers compensation policies at the time of Phathong's injuries. Phathong nevertheless argues Tesco is not entitled to the immunity ordinarily afforded a statutory employer under Colorado law because it "divested itself of any liability for workers' compensation claims" in the Acquisition Agreement. This assertion is not persuasive. As the cases cited above make clear, Tesco had a statutory obligation to provide workers' compensation insurance under Colorado's Workers' Compensation Act. Tesco was unable, as a matter of law, to contract away its workers' compensation liability. *See Peterman v. State Farm Mut. Auto. Ins. Co.*, 961 P.2d 487, 492 (Colo. 1998) (en banc) (holding that parties may not privately contract to abrogate statutory requirements or contravene public policy of Colorado). Contrary to Phathong's suggestion, Tesco's obligation to provide workers' compensation insurance was not "divested by contract" simply because Tesco elected to allocate ultimate payment responsibility between itself and Turnkey for any future claims for workers' compensation benefits.

-10-

Whether a corporation like Tesco is a statutory employer under the terms of § 8-41-401 is dependent upon the nature of the "work contracted out." *Finlay*, 764 P.2d at 64. Colorado employs the "regular business test" to determine whether the party contracting out work is a statutory employee; the test is satisfied "where the disputed services are such a regular part of the statutory employer's business that absent the contractor's services, they would of necessity be provided by the employer's own employees." *Id.* at 66. The Colorado Supreme Court has described its "regular business test" as intentionally broad and has justified an inclusive test as necessary "to accommodate more fully the purposes of the workers' compensation act." *Id.*[9] In applying the regular

---

[9]In this regard, the *Finlay* court noted as follows:

From [more recent Colorado] cases there emerges a broader standard that takes into account the constructive employer's total business operation, including the elements of routineness, regularity, and the importance of the contracted service to the regular business of the employer. This broader standard ensures that an important purpose of section [8–41–101(1)]—that of making general contractors ultimately responsible for injuries to employees of subcontractors—will be fulfilled. That purpose, as well as the more general purpose of the workers' compensation act to compensate injured employees for job-related injuries regardless of fault, would be frustrated were we to revert to the narrow standard applied in [an earlier Colorado case], and focus exclusively on whether the subcontracted activity *directly* relates to the alleged employer's primary business. Such a narrow interpretation of the "regular business" test could potentially bar the recovery of an injured worker who is unable to show negligence and whose primary employer is uninsured and financially irresponsible. This result would clearly

(continued...)

-11-

business test, courts should consider "the constructive employer's total business operation, including the elements of routineness, regularity, and the importance of the contracted service to the regular business of the employer." *Id.* The importance of the contracted service to the employer's total business operation is demonstrated where, absent the contractor's services, the employer would have to provide its own employees rather than forgo having the work performed. *Id.* at 67. In other words, where the work is so essential to the day-to-day business operations of the employer that it cannot continue to function without the task being performed, its importance to the total business operation is demonstrated.

## B. Standard of Review

This court reviews de novo the district court's sua sponte grant of judgment as a matter of law in favor of Phathong on the question of Tesco's status as a statutory employer. *Myklatun v. Flotek Indus., Inc.*, 734 F.3d 1230, 1233-34 (10th Cir. 2013); *cf. Humphrey v. Whole Foods Mkt. Rocky Mountain/S.W., L.P.*, 250 P.3d 706, 708 (Colo. App. 2010) (holding that when the facts supporting an entity's status as a statutory employer are undisputed, the trial court's determination of that status from the undisputed facts is a question of law).

---

[9](...continued)
contravene the long-recognized rule that the workers' compensation act is to be liberally construed to accomplish its humanitarian purpose of assisting injured workers and their families.

*Finlay*, 764 P.2d at 66-67 (quotations and alteration omitted).

Under this standard, the question is whether "a reasonable jury would . . . have a legally sufficient evidentiary basis to find for" Tesco on the question of its status as a statutory employer. Fed. R. Civ. P. 50 (a)(1). The resolution of this case turns heavily on questions of contract interpretation, which are also questions of law subject to de novo review. *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008).

## C. Analysis

The district court concluded that after the closing of the Acquisition Agreement, the relationship between Tesco and Turnkey was not one of a general contractor and subcontractor as envisioned in *Finlay*. Instead, according to the district court, Tesco completely exited the casing drilling services business, EnCana remained the general contractor, and Turnkey took over the subcontractor duties of running the drilling operations. The uncontested facts in the record do not bear out the district court's conclusions. Tesco remained an active participant in the casing drilling services business after the closing of the Acquisition Agreement and, absent the labor provided by Turnkey, would have had to train or hire its own workers to conduct that business. *See Finlay*, 764 P.2d at 67. Thus, because the work performed by Turnkey for Tesco satisfies Colorado's regular business test, the district court erred in ruling Tesco was not Phathong's statutory employer.

-13-

At the moment of the closing of the Acquisition Agreement, Tesco continued to be engaged in the casing drilling services business. Taken together, the Acquisition Agreement and the Rig Personnel Agreement demonstrate Tesco remained obligated to perform its duties to EnCana under the terms of the Master Service Agreement and the EnCana Drilling Contract. There is no evidence in the record indicating Turnkey succeeded in any way to Tesco's relationship with EnCana.[10] Likewise, the Acquisition Agreement and the Rig Personnel

_____

[10]In contrast, the Acquisition Agreement makes quite clear that Turnkey did succeed to Tesco's contractual relationships with those entities holding drilling contracts associated with the drilling rigs transferred by Tesco to Turnkey. *See supra* n.6 (noting Acquisition Agreement obligated Tesco to operate like a pass-through entity for the benefit of Turnkey for those drilling contracts associated with the rigs Turnkey acquired). All this demonstrates, however, is that after the parties closed on the Acquisition Agreement, Tesco's footprint in the casing drilling services business was smaller than it was before the closing. To the extent Phathong argues the lack of an intent on the part of Tesco to continue operations in this sector of its business indefinitely prevents it from being a statutory employer, we note the argument is wrong as both a matter of law and fact. Phathong has not cited, and this court has not found, any indication in Colorado law that the definition of statutory employer set out in the Colorado Code is limited to employers that continue to operate indefinitely under their current business models. Furthermore, such a counterintuitive assertion is at odds with *Finlay*'s statement that the regular business test should focus broadly on a potential statutory employer's regular business operations, not on some narrow notion of its core or primary business. Even if the law were as Phathong imagines it, the record does not demonstrate Tesco intended to exit the casing drilling services business at the scheduled expiration of those drilling contracts associated with the Drillers Technology Corporation rigs. The Rig Personnel Agreement specifically provides as follows:

> The term of this Agreement shall be coterminous with the longest term of the Equipment Leases with [Drillers Technology

(continued...)

-14-

Agreement make clear it was Tesco, not Turnkey, that was obligated to continue making lease payments to Drillers Technology Corporation on the three drilling rigs not transferred to Turnkey under the agreements. Tesco maintained the same role with regard to its business operations on DTC2 as it had prior to the effective date of the Acquisition Agreement: it was still responsible for safety on the rig, providing the labor and equipment necessary to operate the rig, and designating the drilling locations and schedule. The only salient difference flowing from the closing of the Acquisition Agreement was that Tesco no longer had sufficient staff to manage the operation of DTC2 and contracted with Turnkey, who became the crew's direct employer and Tesco's subcontractor, to provide those services. *See Finlay*, 764 P.2d at 67-68 (holding a janitor for a cleaning service was a statutory employee of a computer company because absent the provision of cleaning services by the janitorial company, the computer company would have had to hire new employees or trained its existing employees to do the job).

---

[10](...continued)
Corporation]. If [Tesco] wishes to renew or extend the terms of one or more such Equipment Leases, it shall provide [Turnkey] with not less than 45 days prior written notice thereof and [Turnkey] shall advise [Tesco] in writing within 15 days of its receipt of such notice, whether it has elected to (i) terminate this Agreement at the end of the last initial term of the Lease Agreements, or (ii) extend the term of this Agreement, subject to the same terms and conditions, to coincide with the extended term or terms of the Lease Agreements. Such determination shall be made by [Turnkey] in its sole discretion and, if it elects not to extend the term of this Agreement, it shall have no further obligations to Tesco hereunder at the end of such term.

The nature of the billing process between Tesco and Turnkey also belies the district court's suggestion Turnkey simply took Tesco's place in the employment chain between EnCana and Phathong. Tesco paid Turnkey pursuant to a contractual rate that was not tied in any regard to the rate EnCana paid Tesco under the EnCana Drilling Contract. Likewise, under the Rig Personnel Agreement, Tesco retained the responsibility for designating to Turnkey the drilling locations for the rigs, setting the drilling schedule, and providing a safe workplace environment for the performance of the services under the agreement. *See id.* at 67 n.4 (recognizing this type of control by a statutory employer over the work to be performed is indicative of, but not a necessary predicate to a statutory employment relationship). Finally, the Rig Personnel Agreement defined the relationship of the parties as "independent contractor[s]," with neither party "deemed for any purpose to be, the agent, servant[,] or representative" of the other party. There is absolutely no indication in the record that Tesco and Turnkey acted in derogation of this contractual provision.

## IV. CONCLUSION

The record in this case conclusively demonstrates the work contracted out by Tesco to Turnkey was an important, routine, and regular part of Tesco's casing drilling services business. That being the case, the district court erred in sua sponte granting judgment in Phathong's favor on the immunity question and in denying Tesco's post-trial motion pursuant to Fed. R. Civ. P. 50. Thus, we

**remand** to the district court to **vacate** the jury's verdict in favor of the Phathongs and to, instead, **enter** judgment in favor of Tesco.

ENTERED FOR THE COURT

Michael R. Murphy
Circuit Judge