FILED
United States Court of Appeals
Tenth Circuit

January 6, 2015

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DIEBOLD ENTERPRISES SECURITY
SYSTEMS, INC., a New York
corporation,

      Plaintiff - Appellant,

v.

LOW VOLTAGE WIRING, LTD., a
Colorado corporation, d/b/a LVW
Electronics, Inc.,

      Defendant - Appellee.

No. 14-1010
(D.C. No. 1:13-CV-00505-REB-KLM)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **MURPHY,** and **McHUGH**, Circuit Judges.

## I. INTRODUCTION

The question in this case is whether Diebold Enterprises Security Systems, Inc.

(Diebold) is entitled to recover sales taxes it claims to have incurred in performing work

---

    * After examining Appellant's brief and the appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a)(2) and 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

pursuant to a subcontract with Low Voltage Wiring (Low Voltage). Exercising jurisdiction under 28 U.S.C. § 1291, we conclude Diebold unambiguously released all of its claims related to the subcontract and is therefore not entitled to any additional amounts for sales tax. As a result, we affirm the grant of summary judgment in favor of Low Voltage, but on a different basis than that relied upon by the district court.

## II. BACKGROUND

### *A. Factual Background*

Low Voltage contracted with the United States Army Engineering and Support Center (the Government) to install certain security systems at Fort George G. Meade, Maryland (the Project). In January 2010, Low Voltage hired Diebold to perform some of the work on the Project under a separate subcontract (the Subcontract).

### 1. *Subcontract Provisions*

Of relevance here, the Subcontract contained a number of provisions which impact the total amount due, including contractual provisions in the body of the Subcontract itself, as well as exhibits and contract provisions incorporated into the Subcontract by reference. The provisions in the main body of the Subcontract do not expressly address sales tax, but otherwise limit the Subcontract price. However, government contractor provisions and an exhibit that are incorporated into the Subcontract by reference do make express reference to sales tax. We briefly describe the relevant contract language.

Section C, paragraph (8) of the Subcontract, entitled "Limitation of Funds" contains five subparagraphs, (a) through (e). Joint Appendix (J.A.) 301–302.

Subparagraph (a) establishes the "cumulative total sum presently available for payment and allotted to this Subcontract" as the amount of $6,813,511.58. Subparagraph (a) also states: "Diebold's Pricing Proposal is attached as Exhibit C, Section J and hereby incorporated by reference." *Id.* at 301. In turn, Exhibit C is a "Pricing Proposal Summary," which states a "Total Project Material & Installation with Maintenance & Monitoring" price of "$6,813,511.58," the same amount included in the body of subparagraph (a). *Id.* at 301, 353. Subsequent change orders increased the $6,813,511.58 cumulative total sum allotted to the Subcontract to $7,889,051.49.

Subparagraph (b) of Section C (8) of the Subcontract provides, "The Subcontractor agrees to perform the work on this Subcontract as set forth in the attached Statement of Work incorporated herein as Attachments, Exhibits A and B." J.A. 301. Thus, subparagraph (b) incorporates two exhibits by reference into the Subcontract. Only the first, Exhibit A, is relevant to the issues on appeal. Exhibit A is a "Fort Meade Statement of Work from Diebold" and contains a description of the work to be performed under the Subcontract. *Id.* at 219. The first section of Exhibit A is the "Diebold Executive Summary," *id.*, which includes "Conditions," "Clarifications," and "Exclusions." *Id.* at 243–44. Of significance here, the third-numbered Exclusion states:

> Taxes-All prices for items are exclusive of taxes such as . . . sales . . . taxes which may be imposed by any taxing authority. If such taxes must be paid by Diebold or if Diebold is liable for the collection of such tax . . . , [t]he amount thereof shall be in addition to the amounts at which Diebold offers to sell items herein. Customer agrees to pay all such taxes or to reimburse Diebold for such taxes.

*Id.* at 244. This same "Exclusion" appears in two other sections of Exhibit A: the "Duress Executive Summary" and the "Training Plan." *Id.* at 251, 290.

Subparagraphs C (8)(c) and C (8)(d) also relate to the amount due under the Subcontract:

c.      The Subcontractor agrees to perform work as specified within this Subcontract up to the point at which the total amount paid and payable by [Low Voltage] pursuant to the terms of this Subcontract equals, but does not exceed the total amount actually allotted to the Subcontract.

d.      No notice, communication or representation in any other form or from any person other than written notice from the [Low Voltage's] Contracts Administrator shall affect the amount allotted to the Subcontract. In the absence of the specified written notice, [Low Voltage] shall not be obligated to reimburse the Subcontractor for any costs in excess of the total amount then allotted to the Subcontract, whether those excess costs were incurred during the course of the Subcontract or as a result of termination. Any costs incurred by Subcontractor in excess of the amount allotted shall not be an allowable cost of the Subcontract if the allotment is subsequently increased, unless the specified notice by [Low Voltage's] Contracts Administrator specifically states that such costs are allowable. . . . Change orders issued pursuant to the Changes clause, or any other clause of this Subcontract, shall not be considered an authorization to the Subcontractor to exceed the amount allotted to the Subcontract in absence of a statement in the change order, or other contractual modification, increasing the amount allotted.

*Id.* at 301–302.

The next provision of relevance is found in the "Subcontract Clauses" section of the Subcontract. Paragraph 52, incorporates various Federal Acquisition Regulations (FAR): "This Subcontract incorporates the following clauses by reference, with the same

force and effect as if they were given in full text. . . . 52.229-1[:] State and Local Taxes

. . . 52.229-[3][:] Federal, State And Local Taxes."[1] *Id.* at 311–13. FAR 52-229-3

provides:

> Federal, State, and Local Taxes (FEB 2013)
>
> . . .
>
> (b)    (1) The *contract price includes all applicable Federal, State, and local taxes* and duties, except as provided in subparagraph (b)(2)(i) of this clause.
>
>          (2) Taxes imposed under 26 U.S.C. 5000C may not be—
>
>          (i) Included in the contract price; nor
>
>          (ii) Reimbursed.

48 C.F.R. § 52.229-3 (emphasis added).[2] But the Subcontract also incorporates FAR

52.229-1, which states:

> State and Local Taxes (APR 1984)
>
> *Notwithstanding the terms of the Federal, State, and Local Taxes clause*, the *contract price excludes all State and local taxes* levied on or measured by the contract or sales price of the services or completed supplies furnished under this contract. *The Contractor shall state separately on its invoices taxes excluded from the contract price, and the Government*

---

[1] The Subcontract actually lists Government Acquisition Regulation 52.229-6, but the district court and both parties agree this is a scrivener's error, and that the correct provision on Federal, State and Local Taxes is 52.229-3. We therefore include provision 52.229-3, rather than 52.229-6 in our description of the Subcontract.

[2] The omitted language from 52.229-3 defines various terms, excludes trivial tax increases, and addresses federal taxes that may be imposed after the parties have agreed to the contract, excise taxes, and the consequences of failing to provide notice.

> *agrees either to pay the amount of the taxes to the Contractor or provide evidence necessary to sustain an exemption.*

*Id.* § 52.229-1 (emphasis added).

In summary, neither the Subcontract itself nor Exhibit C, the Pricing Proposal, expressly discusses sales tax. Instead, they both identify a specific dollar amount as the amount proposed to perform the Subcontract and the amount allocated to the Subcontract. The Subcontract further provides that Low Voltage "shall not be obligated to reimburse the Subcontractor for any costs in excess of the total amount then allotted to the Subcontract . . . ." J.A. 301–302. But the Subcontract also incorporates Exhibit A, the Fort Meade Statement of Work, which in three places states the contract price is exclusive of sales taxes and the amount of any sales tax paid or to be collected by Diebold will be paid by the "Customer." Finally, the Subcontract incorporates by reference two FAR provisions: FAR 52.229-3, which states the contract price is inclusive of sales tax, and in apparent contrast, FAR 52.229-1, which provides that "notwithstanding" FAR 52.229-3, the contract price is exclusive of sales tax.

## 2. *Request for Equitable Adjustment and Pass-Through Agreement*

Upon completion of its work under the Subcontract, Diebold asked Low Voltage to submit a Request for Equitable Adjustment (REA) to the Government, requesting that the Government reimburse Diebold for additional costs incurred on the project. Low Voltage agreed to submit a Revised REA, pursuant to a Pass-Through Agreement between Low Voltage and Diebold. The Pass-Through Agreement includes two

paragraphs relevant to the issues on appeal. The first is found in paragraph 5 of the Pass-Through Agreement and contains Diebold's release of all claims against Low Voltage except for those made in the contemporaneous REA and any then-outstanding invoices:

> 5. Except for the instant REA and any outstanding invoices and as otherwise provided in this Agreement, Diebold releases, discharges and agrees to hold [Low Voltage] harmless from any and all REAs, demands, charges or claims of any kind or nature whatsoever, from any and all damages, actions or causes of action, either in law or in equity, which it may now have, which are known or unknown by Diebold at the time of execution of this Agreement, that relate to the Project.

J.A. 129.

Paragraph 6 of the Pass-Through Agreement states that upon resolution of the REA and the payment of Diebold's outstanding invoices, the release contained in paragraph 5 shall become absolute and final as to all of Diebold's claims against Low Voltage:

> 6. It is the purpose of this [Pass-Through] Agreement, except for the conditions set forth above, forever to settle, adjust, and discharge all REAs or claims of whatever kind or nature that Diebold may have accrued against [Low Voltage] which relate to the Project. Upon resolution of Diebold's REA and final [Low Voltage] payment of Diebold's outstanding invoices, the release described in ***Paragraph 5*** shall thereupon become absolute and final as to all of Diebold's claims against [Low Voltage].

*Id.* Low Voltage submitted the REA on behalf of Diebold, but the Government rejected it. The REA did not include any amounts for sales tax. All the invoices Diebold submitted to Low Voltage as of the time of the Pass-Through Agreement have been paid.

-7-

### 3. Final Release

After the Government denied the REA, Diebold submitted final Invoice #082830 to Low Voltage on May 18, 2012 (the Invoice). The Invoice requested a final installment payment of $930,995.43, which, when added to the installment payments previously paid, would total the cumulative total sum of $7,889,051.49 allotted to the Subcontract. In addition, the Invoice sought $470,646.15 in sales taxes Diebold claimed it had paid to the State of Maryland in connection with the project.

A few days later, on May 21, 2012, Diebold and Low Voltage executed a Final Release of Claims. Low Voltage then paid $830,995.43 to Diebold—the $930,995.43 installment payment requested in the Invoice minus $100,000 related to warranty issues not at issue in this case—but did not pay the amount invoiced for sales tax. Low Voltage eventually paid the $100,000 it had withheld from the final contract installment, but it refused to pay the $470,646.15 Diebold had requested for reimbursement of sales tax.

### B. *Procedural Background*

On February 26, 2013, Diebold sued Low Voltage for breach of contract based on its failure to pay the sales tax. Three months later and before discovery was completed, Low Voltage filed a motion for summary judgment, arguing Diebold had waived and released all claims against Low Voltage in the Final Release and in the Pass-Through Agreement. Diebold opposed summary judgment, claiming both releases were conditional releases premised on payment of the sales taxes at issue in the lawsuit. To support its position, Diebold pointed to the language of the Final Release indicating the

parties entered into it pursuant to the terms of the Subcontract and to induce payment of the Invoice. Diebold asserted that because both the Subcontract and the Invoice required payment of sales taxes, the Final Release did so as well.

In reply, Low Voltage continued to assert that the Pass-Through Agreement and Final Release plainly waived Diebold's claim. Low Voltage also claimed that Diebold was never entitled to sales tax under the Subcontract. Low Voltage advanced three arguments in support of this position: (1) the Subcontract expressly rejects different or additional terms, so Exhibit A was an unconsented-to variance from the terms of the Subcontract; (2) incorporation of the Federal Acquisition Regulations shows the contract price already included sales tax; and (3) the plain language of the pricing provision caps Diebold's reimbursement to the allotted Subcontract price.

Diebold moved to strike the newly-raised arguments in Low Voltage's reply and, in the alternative, moved for leave to file a surreply to address the question of whether the Subcontract provided Diebold a right to sales tax. Although Diebold had briefed its position that the Subcontract obligated Low Voltage to reimburse Diebold for sales tax in addition to paying the Subcontract price, it claimed it had been given no opportunity to respond to Low Voltage's reliance on the Federal Acquisition Regulations raised for the first time in reply. The district court denied the motion to strike but granted the motion to file a surreply. Diebold's surreply focused only on whether the Federal Acquisition Regulations were incorporated by reference into the Subcontract.

Ultimately, the district court granted Low Voltage's motion for summary judgment. But instead of ruling on the grounds Low Voltage raised in the initial motion—that Diebold had released all claims against it in the Pass-Through Agreement and in the Final Release—the district court held the terms of the Subcontract clearly and unambiguously limited the total amount available to Diebold to the cumulative total sum allocated to the Subcontract. Accordingly, the district court concluded Diebold had no contractual right to request reimbursement for sales tax in excess of that sum. It declined to address as moot whether Diebold had released all claims against Low Voltage. Diebold now appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm, but on the alternative ground that Diebold released all claims against Low Voltage.

### III. DISCUSSION

#### A. *Standard of Review*

We review a grant of summary judgment de novo, applying the same standards as the district court. *Merrifield v. Bd. of Cnty. Comm'rs*, 654 F.3d 1073, 1077 (10th Cir. 2011). In a diversity case, we apply state law to the underlying claims while federal law governs the propriety of a grant of summary judgment. *Reid v. Geico Gen. Ins. Co.*, 499 F.3d 1163, 1167 (10th Cir. 2007). "Therefore, the substantive law of [Colorado] applies

and governs as we review the issues raised on appeal in this case." *Kovnat v. Xanterra Parks & Resorts*, 770 F.3d 949, 954 (10th Cir. 2014) (internal quotation marks omitted).[3]

Summary judgment shall be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing summary judgment, "[w]e examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the nonmoving party." *Merrifield*, 654 F.3d at 1077.

## B.  Analysis

"[I]t is well established that 'we are free to affirm a district court decision on any ground for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court.'" *Okla. ex rel. Office of State Fin. v. United States*, 292 F.3d 1261, 1264 (10th Cir. 2002) (brackets omitted) (quoting *United States v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir. 1994)). Affirming on an alternative basis is appropriate "so long as the appellant has had a fair opportunity to address that ground."

---

[3] The Final Release does not include a choice of law provision that could invoke another forum's law. The Subcontract does. The Subcontract is to be governed, to the extent possible, by "the law of US Government contracts as set forth by statute and applicable regulations and decisions by the appropriate courts and the Boards of Contract Appeals," and beyond that, by the laws of Colorado. The Supreme Court has held that ordinary government contracts are generally governed by the rules applicable to contracts between private parties. *United States v. Winstar Corp.*, 518 U.S. 839, 914 (1996). Thus, irrespective of whether the choice of law provision in the Subcontract is applied to the Final Release, we rely on Colorado law to interpret both contracts.

*Merrifield*, 654 F.3d at 1077. We do so here and hold the Final Release unambiguously bars Diebold from seeking further recovery under the Subcontract.[4]

"A release is the relinquishment of a vested right or claim to a person against whom the claim is enforceable." *Neves v. Potter*, 769 P.2d 1047, 1049 (Colo. 1989). "A general release is an instrument by which one party relinquishes all its claims against another for consideration. Once a claim is released, the release bars the injured party from seeking further recovery." *CMCB Enters., Inc. v. Ferguson*, 114 P.3d 90, 96 (Colo. App. 2005).[5]

Releases are interpreted using normal tools of contract interpretation. *Neves*, 769 P.2d at 1053. The purpose of contract interpretation is to determine the mutual intent of the parties. *See E. Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 973 (Colo. 2005); *Neves*, 769 P.2d at 1055 (endorsing United States Supreme Court cases that "viewed intent as the polestar to determining the scope of a release."). Our

---

[4] Because we reach this conclusion, we need not address the alternative grounds Low Voltage offers for affirming the district court's decision, including: whether the Subcontract required Low Voltage to compensate Diebold for sales tax; whether Diebold failed to comply with the Subcontract's invoicing requirements by billing Low Voltage for all incurred sales tax over seven months after Diebold completed its work under the Subcontract, rather than by the tenth day of the month following the month in which the expense was incurred; and whether Diebold waived its claim by failing to ask for sales tax in the Request for Equitable Adjustment.

[5] Although we are not bound by the opinions of state intermediate courts of appeals in diversity cases, their opinions provide guidance. *Martin K. Eby Const. Co. v. OneBeacon Ins. Co.*, ___ F. 3d ___, No. 13-3076, 2014 WL 6910685, at *4 (10th Cir. Dec. 9, 2014).

starting point is the plain language of the contract. *May v. United States*, 756 P.2d 362, 369 (Colo. 1988). That plain language must be examined and construed according to the generally accepted meaning of the words used. *Lake Durango Water Co. v. Pub. Util. Co.*, 67 P.3d 12, 20 (Colo. 2003). In determining a contract's meaning, we must examine the entire instrument instead of viewing clauses or phrases in isolation. *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002). We strive to harmonize different parts of a contract to give all relevant provisions effect. *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008) (applying Colorado law). In this endeavor, "a more specific provision controls the effect of general provisions." *Id.* (quoting *E-470 Pub. Highway Auth. v. Jagow*, 30 P.3d 798, 801 (Colo. Ct. App. 2001), *aff'd*, 49 P.3d 1151 (Colo. 2002)).

"When a contractual provision unambiguously resolves the parties' dispute, the interpreting court's task is over." *Id.* at 1154. On the other hand, if a contract is ambiguous, then extrinsic evidence of the parties' intent is admissible. *E. Ridge*, 109 P.3d at 973. A contract is ambiguous "if it is fairly susceptible to more than one interpretation." *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo. 1996).

In the present case, the Final Release provides:

> Pursuant to the terms of Master Subcontract # 1521, for value received, and in order to induce payment of final invoice #082830, and in consideration of the total sum of the subcontract in the amount of $7,889,050.18 which has been received and paid for in accordance with the contracted Terms and Conditions under Master Subcontract # 1521 for the benefit of the Fort Meade DISA Project said Subcontractor, Diebold Enterprise Security Systems, Inc., does remise, release, and discharge [Low Voltage], its

-13-

officers, agents and employees, of and from all liabilities, obligations, claims, and demands whatsoever under or arising from the said Subcontract, including modifications.

**NO ADDITIONAL INVOICE (S) WILL BE SUBMITTED AND NO FUTURE CLAIMS WILL BE MADE; CONSIDER THIS SUBCONTRACT CLOSED.**

J.A. 175.

By its terms, the Final Release contains four relevant clauses: that it was (1) entered into "Pursuant to the terms of [the Subcontract]," (2) entered into "in order to induce payment of final invoice #082830," (3) entered into "in consideration of the total sum of the subcontract in the amount of $7,889,050.18 which has been received and paid for," and (4) entered into in exchange for Diebold's promise to "remise, release, and discharge [Low Voltage] . . . of and from all . . . claims . . . arising from the said Subcontract." To give each of these clauses effect, the Final Release must be interpreted such that Diebold has released all claims against Low Voltage, including any claim for sales tax. *See Level 3 Commc'ns*, 535 F.3d at 1154.

To begin, the Final Release references the terms of the Subcontract, indicates value has been received, and states "in order to induce payment of final invoice #082830." These recitals provide context for the release by acknowledging the dispute between the parties over the terms of the Subcontract as they relate to payment of the Invoice. *See Rocky Mountain Ass'n of Credit Mgmt. v. Hessler Mfg. Co.*, 553 P.2d 840, 842 (Colo. App. 1976) (A release must be "construed in light of the manner in which its

-14-

terms relate to all of the circumstances surrounding the transaction."). As explained, Low Voltage claimed the Subcontract limited the amounts due to Diebold to the cumulative total sum allotted to the Subcontract, which was initially $6,813,611.58, but later increased to $7,889,051.49. The $930,995.43 installment payment requested in the Invoice, if paid, would bring the total amount Low Voltage had paid to Diebold under the Subcontract to that $7,889,051.49 cumulative total sum. But the Invoice also includes Diebold's request for sales tax, which, if paid, would have exceeded the cumulative total sum allocated to the Subcontract by $470,646.15. Instead of creating binding obligations, the introductory clauses of the Final Release merely place it in context by generally identifying the Subcontract and indicating that for an unspecified "value received," Diebold was entering into the Final Release to induce payment of the Invoice.

Next, the Final Release makes specific reference to the amount of "consideration" given in exchange for Diebold's release of claims. It states, "in consideration of the total sum of the subcontract in the amount of $7,889,050.18 . . . , [Diebold] does remise, release, and discharge [Low Voltage] . . . from all liabilities, obligations, claims, and demands whatsoever under or arising from the said Subcontract . . . ." Unlike the general prior reference to "value received," the following clause expressly defines the "consideration" paid for the release of claims as "the total sum of the subcontract in the amount of $7,889,050.18." As a result, the Final Release resolves the dispute concerning payment of the Invoice in favor of the position asserted by Low Voltage. As

-15-

discussed, if Low Voltage paid the $930,995.43 Diebold requested in the Invoice as the final contract installment, but not the $470,646.15 Diebold requested as sales tax, the cumulative sum total paid under the Subcontract would equal $7,889,051.49.[6] Thus, by identifying the consideration for the Final Release as that sum, the parties excluded the amount Diebold requested for sales tax. Otherwise, the consideration identified for the release of claims by Diebold would have been $8,359,696.33 ($7,889,050.18 + $470,646.15).

The last relevant provision of the Final Release is the bolded and capitalized sentence: "**NO ADDITIONAL INVOICE (S) WILL BE SUBMITTED AND NO FUTURE CLAIMS WILL BE MADE; CONSIDER THIS SUBCONTRACT CLOSED.**" This final statement leaves no doubt that upon receipt of the stated consideration of $7,889,050.18, Diebold was not entitled to any other amounts under the Subcontract, including amounts it claimed for sales tax.

In summary, the first three clauses of the Final Release identify the Subcontract and the outstanding Invoice. The operative language of the Final Release is found in the latter two clauses, which expressly identify the dollar amount of the consideration exchanged for Diebold's release of all claims against Low Voltage. Diebold concedes

---

[6] The parties agree the total sum owed under the Subcontract, after change orders, was $7,889,051.49, not the $7,889,050.19 identified in the Final Release. Neither party has attached any significance to this $1.30 discrepancy, and we agree that it is unimportant.

that Low Voltage made the final installment payment of $930,995.43, and thus Low Voltage paid the $7,889,050.18 identified in the Final Release. In exchange, Diebold released all claims against Low Voltage arising from the Subcontract and the Subcontract was closed. Under the plain language of the Final Release, Low Voltage is entitled to summary judgment on Diebold's claim to recover any additional amounts.

In reaching that conclusion, we reject Diebold's argument that the Final Release was contingent upon the payment of sales tax. According to Diebold, the statements that the release was entered into pursuant to the Subcontract and to induce payment of the Invoice indicate that all amounts due under the Subcontract and the full amount requested in the Invoice must be paid before the release is effective. We reject this interpretation.

First, there is nothing in the Final Release that expressly makes it conditional on any future event. "[A] condition precedent in a contract is not favored and will not be given effect unless established by clear and unequivocal language." *Main Electric, Ltd. v. Printz Servs. Corp.*, 980 P.2d 522, 526 (Colo. 1999). Rather than being contingent upon future payment of sales tax, the Final Release states that upon the payment of the full Subcontract price, which is specifically defined as $7,889,050.18, Diebold "does . . . release" all of its claims against Low Voltage and the Subcontract is closed. If the reference to the Subcontract in the Final Release was intended to allow Diebold to sue Low Voltage for an alleged breach of the Subcontract, such as failure to pay sales tax, then Diebold's promise to "remise, release, and discharge [Low Voltage] of and from all . . . claims . . . arising from the said Subcontract" would have been limited accordingly.

-17-

But there is nothing in the express language of the Final Release that supports any limitation to the general release of all claims arising from the Subcontract. Here, there is no clear or unequivocal language making the general release of claims conditional upon Low Voltage's payment of the $470,646.15 that Diebold requested for sales taxes.

Second, a general statement that the Final Release is entered into pursuant to the Subcontract does not incorporate a requirement to pay sales tax, because the parties disagreed on whether the Subcontract permitted Diebold to seek reimbursement from Low Voltage for such expenses. Thus, a reference to the Subcontract does not reflect a meeting of the minds to make the Final Release conditional on the payment of sales tax. Instead, it simply identifies the subject matter of the Final Release as the dispute about the payment of the Invoice under the Subcontract. To interpret the "pursuant to" language as Diebold suggests—making the release conditional to Low Voltage's performance of its obligations under the Subcontract—would directly contradict the broad language of the Final Release which discharges all claims "under or arising from the Subcontract." Accordingly, we reject this interpretation. *See Level 3 Commc'ns,* 535 F.3d at 1154 (providing that we interpret contracts to give effect to all provisions).

Similarly, although the Final Release indicates it was entered to induce payment of the Invoice, it does not state the Invoice would be paid "in full." And by negative implication, the language suggests Low Voltage had refused to pay the Invoice prior to Diebold's execution of the Final Release. *See Shams v. Howard*, 165 P.3d 876, 880 (Colo. Ct. App. 2007) (providing that negative implications are useful when interpreting

contract terms); *Ball Corp. v. Fisher*, 51 P.3d 1053, 1062 (Colo. Ct. App. 2001) (same). Although this clause highlights the parties' dispute concerning the Invoice, it does not indicate a resolution based on the payment of consideration other than that specifically identified in the Final Release. Accordingly, we reject Diebold's argument that the references to the Subcontract and the Invoice implicate a promise to make some future payment of the sales taxes claimed in the Invoice.

In addition, Diebold's interpretation would effectively read out the consideration clause of the Final Release, which states "in consideration of the total sum of the subcontract in the amount of $7,889,050.18 . . . Diebold . . . does remise, release, and discharge [Low Voltage] . . . from all liabilities, obligations, claims, and demands whatsoever under or arising from the said Subcontract . . . ." We reject interpretations of a contract that do not give effect to relevant clauses. *See Level 3 Commc'ns*, 535 F.3d at 1154. Diebold's reading would also ignore the specific amount of consideration stated in the Final Release. In contrast, our interpretation enforces that unambiguous statement identifying the amount exchanged for the release of claims, while also giving meaning to the opening clauses as placing the agreement in context. But even if those opening clauses could be construed to be a general reference to Diebold's rights under the Subcontract, the more specific clause setting forth the specific amount of consideration paid for the release of all claims under or arising from the Subcontract would take precedence. *See Green Shoe Mfg. Co. v. Farber*, 712 P.2d 1014, 1016 (Colo. 1986) ("[S]pecific provisions in contract express more exactly what parties intend than broad or

general clauses.") (citing *Denver Joint Stock Land Bank v. Markham*, 107 P.2d 313 (Colo. 1940)).

For these reasons, we conclude Diebold unambiguously released all of its claims against Low Voltage under or arising from the Subcontract, including its claim for the reimbursement of sales taxes.

## IV.CONCLUSION

Therefore, we AFFIRM the judgment of the district court granting summary judgment, but on the alternative ground that the Final Release entitles Low Voltage to judgment as a matter of law.

ENTERED FOR THE COURT


Carolyn B. McHugh
Circuit Judge