**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 17, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

LEADER COMMUNICATIONS, INC.,

Petitioner,

v.

FEDERAL AVIATION
ADMINISTRATION,

Respondent.

--------------------------

TETRA TECH AMT, INC.,

Intervenor - Respondent.

No. 18-9510
(FAA No. ODRA-17-812)
(Federal Aviation Administration)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **MURPHY**, and **McHUGH**, Circuit Judges.
_____

Leader Communications, Inc. (LCI) has filed a petition seeking review of a

final administrative decision. The Federal Aviation Administration (FAA) issued a

Screening Information Request (akin to a bid request) to provide operational and

administrative support services for its Office of Security and Hazardous Materials

(ASH). LCI submitted a proposal but was eliminated in part because Volume 2 of its

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

proposal did not fully comply with font size requirements. LCI filed a protest in the FAA's Office of Dispute Resolution for Acquisition (ODRA), which the ODRA later rejected. The FAA adopted the ODRA's Findings and Recommendations as its final decision, and now LCI petitions this court for relief.

In its petition, LCI asks this court to grant review of the FAA's final order and remand with instructions to allow LCI to participate in the bidding process for the ASH contract. LCI also seeks to supplement the administrative record to include documents related to prior protests concerning this same contract. Exercising jurisdiction pursuant to 49 U.S.C. § 46110, we DENY both the motion to supplement and the petition for review.

# I

## A.    Factual Background

When the FAA needs a vendor for services, it begins an acquisition by issuing a Screening Information Request (SIR). Interested parties may then submit proposals in response to the SIR. These proposals are evaluated within the FAA by a product team. *See* 14 C.F.R. § 17.3(t). Any protests concerning SIRs are filed with the ODRA. *Id.* § 17.13(a).[1] The ODRA then makes findings and recommendations and refers the findings and recommendations to the Administrator of the FAA. The Administrator then enters a final order either adopting or rejecting the ODRA's

---

[1] The Administrator of the FAA has delegated the authority to conduct dispute resolution and adjudicative proceedings concerning acquisitions to the ODRA. 14 C.F.R. § 17.5(a).

2

decision, and the ODRA's findings and recommendations are shared with the parties and the public when the final FAA order is issued. *Id.* § 17.21(o).

This dispute arises out of an FAA acquisition for support services for ASH. The acquisition involves a five-year, $75M contract. The acquisition process has not gone smoothly; the protest at issue in this petition for review is LCI's eighth protest since 2014 concerning the same underlying acquisition. None of the previous seven protests are currently at issue in this petition, but LCI asserts that the prior protests inform the background of the dispute and it asks this court to supplement the administrative record accordingly.

The administrative record does provide the following background. LCI filed several protests related to the Product Team's evaluation of LCI's proposal under a previous SIR. After a series of corrective actions resulting from those protests, LCI was named the best value awardee for the five-year contract from the FAA. For reasons that are unclear from the record but not germane to this petition, LCI was not allowed to immediately transition to performance of the contract despite being named the best value awardee. LCI protested, and the ODRA ruled that the procurement process for the ASH contract should begin anew, in accordance with the FAA's Acquisition Management System (AMS),[2] but on an expedited schedule. The new

---

[2] The rules and policies for AMS are available at: https://fast.faa.gov/docs/acquisitionManagementPolicy/acquisitionManagementPolicy_3.pdf (last visited Dec. 12, 2018).

procurement process (and LCI's elimination from that process) is now directly at issue in this petition for review.

The Product Team began the new procurement process by issuing a new SIR (SIR No. DTFAWA-17-R-00024) on March 3, 2017. This SIR, like the previous one, requested proposals to furnish support services for ASH. After several amendments,[3] the SIR instructions eventually provided:

> Proposals must be provided in standard letter size 8-1/2 by 11 inch format. The font for text must be Times New Roman, size 12 point, with one inch margins for the left, right, top and bottom of each page. The font for graphics, illustrations, and charts must be eight point or larger. The Offeror may use oversize pages (which must be 17" x 11") where appropriate to contain complex or extensive graphic presentations. Oversize pages count as 2 pages and margin and font size requirements apply to all oversize pages. (These formatting requirements do not apply to the Volume V Bid Model.)

Agency Record ("AR") at 591. This requirement was listed in section L.11.1 of the SIR, and is referred to by the parties as the section L.11.1 requirement. The SIR did not define "graphics, illustrations, and charts," and none of the amendments provided a definition either. The SIR also established page limits.

According to the SIR, offerors had to submit proposals in six different volumes. Further, the SIR outlined the FAA's two-tier evaluation approach for the acquisition. Tier 1 was limited to small business proposals, while Tier 2 included

---

[3] SIR No. DTFAWA-1-R-00024 was amended ten times after it was issued on March 3, 2017. *See* AR at 322 (March 6); *id.* at 442 (March 7); *id.* at 460 (March 10); *id.* at 470 (March 18) (SIR amended in its entirety); *id.* at 636 (March 21); *id.* at 638 (March 22); *id.* at 642 (March 23); *id.* at 648 (March 24); *id.* at 650 (March 29); *id.* at 652 (March 30). The font size requirements at issue in this petition for review first appeared in the March 18 amendment.

proposals from primarily large offerors. If two or more small businesses in Tier 1 qualified for the award, then the Tier 2 proposals would not be considered. To become "qualified," an offeror needed to receive a "Pass" rating for Volume 1 of the proposal,[4] "Satisfactory" or higher ratings for both Volume 2 and 3,[5] and a "Sufficient" rating for Volume 6.[6] The SIR required the FAA to select the offeror proposing the "best value" to the Government.

LCI submitted its proposal on the deadline for submissions (April 3, 2017) to the point person on the Product Team, the Contracting Officer. The Product Team gave LCI a "Pass" rating for Volume 1, and passed along the proposal to the Technical Evaluation Team (TET), who was responsible for the technical evaluation for Volume 2. However, TET became concerned during its evaluation that LCI had not complied with the font size requirements in section L.11.1. TET then informed the Contracting Officer that LCI had not complied with L.11.1, and that TET feared LCI was therefore able to include more information in its proposal than other offerors who complied with both the font size requirements for text and page limits. TET advised the Contracting Officer of three potential remedies: disqualify LCI for its noncompliance, consider its noncompliance with the SIR in the evaluation as a major risk factor, or seek clarification from LCI regarding its noncompliance.

---

[4] Volume 1 addressed an offeror's "Minimum Capability Qualification."

[5] Volume 2 covered an offeror's "Technical" approach and Volume 3 detailed an offeror's "Management" approach.

[6] Volume 6 explained an offeror's "Past Performance."

The Contracting Officer decided not to disqualify LCI outright. Instead, the Contracting Officer notified LCI of its noncompliance with section L.11.1 on May 8, 2017, and invited LCI to bring its proposal into compliance. The Contracting Officer did not, however, tell LCI which portions of the proposal were not compliant with section L.11.1. Rather, the Contracting Officer restated the requirements under section L.11.1 and informed LCI that several of its sections in Volume 2 contained text that was smaller than 12-point font but were not graphics, illustrations, or charts. The Contracting Officer gave LCI until 5:00 PM on May 11, 2017, to submit a revised proposal that was textually consistent with its previous submission. LCI did not ask for any further clarification from the Contracting Officer or Product Team concerning the requirements in section L.11.1.

LCI submitted an updated version of Volume 2 that it thought would comply with section L.11.1. When LCI submitted the revised Volume 2, it also included a letter explaining that its exhibits were intended to be graphics, illustrations, or charts, and not narrative text. LCI changed Exhibits C, D, F, G, H, I, K, and M for its revised Volume 2.[7]

The Contracting Officer reviewed the revised Volume 2 and determined that, despite the revisions, Volume 2 still did not comply with section L.11.1. Once again,

---

[7] The original and revised exhibits are located at the following locations in the sealed record, with the first page range referring to the original exhibit and the second page number referring to the revised exhibit: Ex. C (695, 759); Ex. D (696–97, 760); Ex. F (698–701, 762); Ex. G (703–06, 765); Ex. H (707–08, 767); Ex. I (709–10, 769); Ex. K (711–14, 772); Ex. M (715–17, 775).

however, the Contracting Officer did not eliminate LCI from consideration for is noncompliance. Instead, the Contracting Officer informed TET that, in her opinion, the revised Volume 2 still did not comply with section L.11.1, but also asked TET to evaluate the revised proposal. The Contracting Officer further directed TET "when evaluating the resubmittal [to] not include any of the information in any of the exhibits as part of your evaluation." AR at 1292 (alteration in original). TET evaluated LCI's Volume 2 and assigned it a non-qualifying rating, thus LCI was eliminated from consideration. After TET sent its assessment to the Contracting Officer, the Contracting Officer prepared a memorandum explaining her decision and notified LCI of its elimination from further consideration. LCI filed a bid protest with the ODRA challenging this decision.

After LCI filed its protest, the Product Team realized that TET may have misunderstood the Contracting Officer's instructions regarding the evaluation of LCI's revised proposal. Instead of disregarding only non-compliant exhibits in the revised Volume 2, one member of TET did not consider *any* exhibit in its Volume 2 evaluation. The Product Team came up with the following corrective action plan to ensure that LCI would be treated fairly:

1.    The Product Team will document specifically what portions of LCI's technical proposal are noncompliant with section L.11 of the SIR.

2.    The Product Team will then reevaluate LCI's technical proposal, including all portions determined to be compliant.

3.    The Product Team will then proceed with its evaluation of LCI in accordance with the SIR and evaluation plan, including submitting the results to the source selection official (SSO) for her consideration.

*Id.* at 939. In accordance with the corrective action, TET determined that Exhibits C, D, F, G, H, I, K, and M in both the original and revised Volume 2 were not compliant with section L.11.1. TET then found that, to maintain fairness to complying offerors, it had to include only compliant exhibits in its evaluation. TET then evaluated the compliant portions of the revised Volume 2, and assigned LCI the same score it had previously received, and as such LCI was not "qualified." The Contracting Officer reviewed the same exhibits and agreed with TET's assessment, as did the source selection official.

## B.    Procedural Background

This petition for review concerns only LCI's final protest in its series of protests stemming from the FAA's acquisition for support services for ASH. In the protest at issue in this petition, the ODRA determined that the SIR's language regarding font size for graphics, illustrations, or charts was unambiguous, and that LCI had not met its burden to show the Product Team acted irrationally by not evaluating LCI's nonconforming exhibits. The ODRA also found that the Product Team's communications with LCI regarding LCI's nonconforming exhibits complied with AMS.

The FAA adopted the ODRA's Findings and Recommendations and denied LCI's protest in its entirety. LCI timely petitioned this court for review, and later moved to supplement the administrative record.

8

We will first address LCI's motion to supplement the administrative record before reviewing the actions of the FAA.

## A.     Motion to Supplement

The record from an administrative proceeding consists of "(1) the order involved; (2) any findings or report on which it is based; and (3) the pleadings, evidence, and other parts of the proceedings before the agency." Fed. R. App. P. 16(a). In this case, the FAA compiled the administrative record and certified that the documents provided comprised the complete record for the challenged order. *See* Dkt. 10549720. The FAA's certification is entitled to a presumption of administrative regularity and good faith, and may only be overcome by clear and convincing evidence. *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993).

LCI seeks leave to supplement the administrative record with certain documents (listed in bullet points a–h of its motion) which LCI contends will "provide the appropriate amount of context for this Court to review these issues." Mot. Supp. 4. The ODRA's opinion below provides a cursory background of these documents, noting that the protest that it reviewed is the eighth protest related to the FAA's acquisition of support services for ASH. The ODRA noted this background in 1.5 paragraphs of its nearly twenty-page Findings and Recommendations.

In their entirety, the 1.5 paragraphs state:

> The instant matter is the eighth in a series of Protests of the same underlying acquisition dating back to 2014. *Protests of Leader Communications, Inc.*, 14-ODRA-00705, 15-ODRA-00721, 15-ODRA-

00753, 16-ODRA-00765, and 16-ODRA-00768, *Protest of Tetra Tech AMT*, l5-ODRA-00760, and *Protest of Encentric, Inc.*, 17-ODRA-00792. In response to Case Numbers 15-ODRA-00760 and l6-ODRA-00768 filed by Tetra Tech and LCI, respectively, the Product Team elected voluntary corrective action, which provided for a new solicitation and evaluation. *Protest of Tetra Tech AMT*, 15-ODRA-00760 and *Protest of Leader Communications, Inc.*, 16-ODRA-00768 (Consolidated).

LCI protested the Product Team's proposed corrective action. *Id.* The ODRA sustained LCI's Protest, and established a compressed schedule for the corrective action. *Id.* ("A Product Team's discretion to undertake corrective action is not absolute.")

AR at 1290. The Findings and Recommendations show that the ODRA only "relied" on the prior protests to provide some background factual context for the present protest. Further, nothing in the Findings and Recommendations shows that the ODRA relied on any information contained in the prior protests in its analysis. As we similarly only note this information to provide general background for this dispute, we deny the motion to supplement the administrative record.

B.    Standard of Review

This is a petition for review of a final decision by the FAA pursuant to 49 U.S.C. § 46110. We review the FAA's final decision adopting the ODRA's Findings and Recommendations under the same arbitrary or capricious standard utilized in the Administrative Procedure Act. *See Multimax, Inc. v. FAA*, 231 F.3d 882, 886 (D.C. Cir. 2000) (using the arbitrary and capricious standard provided by 5 U.S.C. § 706(2)(A) when reviewing a challenge under 49 U.S.C. § 46110(c) to a final order of the FAA adopting the findings and recommendations of the ODRA). "The APA's arbitrary and capricious standard is a deferential one; administrative determinations

10

may be set aside only for substantial procedural or substantive reasons, and the court cannot substitute its judgment for that of the agency." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1164 (10th Cir. 2002).

The ODRA's findings of fact, if supported by substantial evidence, are conclusive. 49 U.S.C. § 46110(c). Questions of law, including whether contract terms are ambiguous, are reviewed de novo. *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008).

## C. Review of Administrative Decisions

### 1. Plain Language of Section L.11.1 and Related Communications

Under the law of government contracts, an offeror's proposal must comply with the formatting guidelines of an agency's solicitation. *See Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1351 (Fed. Cir. 2013). In this case, section L.11.1 of the SIR provided the following guidelines for font sizes:

> The font for text must be Times New Roman, size 12 point, with one inch margins for the left, right, top and bottom of each page. The font for graphics, illustrations, and charts must be eight point or larger.

AR at 118. The present dispute turns on the definition of "graphics, illustrations, and charts," and whether these terms are unambiguous. LCI asserts that "the FAA has never put forth a coherent interpretation of 'graphics, illustrations, and charts,'" and that "[t]he FAA eliminated LCI based on the FAA's apparently secret interpretation of 'graphics, illustrations, and charts.'" LCI Opening Br. 28–29. The FAA responds that the SIR's plain language, common sense, and LCI's own communications

11

support the understanding that "'graphics, illustrations, and charts' are primarily pictorial, rather than textual, in nature." FAA Br. 22.

The ODRA recognized, and we agree, that the plain language of the SIR unambiguously communicates that narrative-style text must be 12-point font size, whereas text related to visuals ("graphics, illustrations, and charts") may be smaller, down to 8-point font size. Even LCI appeared to recognize this in the proceedings before the ODRA. There, LCI argued that it reasonably interpreted "chart" to include "a sheet of paper ruled and graduated for use in a recording instrument." AR at 123 (quoting Merriam-Webster website). The dictionary definition cited by LCI included three other definitions, including "a sheet giving information in tubular form," "graph," and "diagram." *Id.* at 123 n.4 (quoting Merriam-Webster website). The ODRA held that the dictionary definitions cited by LCI supported finding that the language in section L.11.1 was unambiguous. We agree; the plain meaning of the terms in question unambiguously suggests that there must be some pictorial element conveying meaning before something is considered a graphic, illustration, or chart.

A cursory view of the noncompliant exhibits and compliant exhibits demonstrates this principle. The original Volume 2 exhibits that LCI revised were text boxes with bullet-point text. Some spanned three or more pages. The revised versions feature more aesthetically-pleasing text boxes that include shading, coloring, and prominent labels. But these "visual" elements (bullet points, boxed lines around text, coloring) convey no additional meaning apart from the text contained in the text

12

boxes. For example, consider Exhibit I, which LCI highlighted at oral argument.[8] Exhibit I contains three differently colored boxes, each with a header, aligned next to each other. Under each header is a text explanation containing at least forty words. Changing the layout or order of the three boxes does not alter any meaning conveyed by (or within) the boxes. A change of color or shading, or even removing the outlines of the boxes entirely, would not modify the message conveyed by (or within) the boxes.

In contrast, consider Exhibit J,[9] which LCI also highlighted at oral argument. Exhibit J is a table with eight columns and nine rows. Its left-most column contains entries with text-heavy descriptions; its top row lists specific provisions detailed in the SIR. The body of the table features small squares where the text-heavy descriptions overlap and show how LCI will fulfill specific needs detailed in the SIR overall. The table, therefore, contains pictorial elements (the small squares, rows, and columns) that convey additional meaning separate from the text (how certain experience overlaps with the requirements listed in the SIR). Removing these pictorial elements would also remove this additional meaning. The Product Team recognized this, and therefore deemed Exhibit J compliant and Exhibit I noncompliant.

---

[8] AR at 769 (sealed).

[9] AR at 770 (sealed).

Further, even if the plain meaning of "graphics, illustrations, and charts" were ambiguous, the ambiguity would be a patent ambiguity. "[A]n ambiguity on the face of the contract—a 'patent' ambiguity—triggers a duty on behalf of a public contractor to inquire about that ambiguity before it even bids on a contract." *P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1355 (Fed. Cir. 2002). Offerors who do not challenge patent ambiguities in solicitations prior to submitting a bid waive that challenge. *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1313 (Fed. Cir. 2016). LCI never sought clarification regarding what constituted a "graphic, illustration, or chart" prior to submitting its proposal. Further, when LCI was alerted to the fact that its proposal was not in compliance with the SIR, it never asked the Product Team or Contracting Officer to identify how its proposal failed to comply with section L.11.1.

Even in the face of these failings, we address LCI's remaining arguments. LCI argues that the Product Team abused its discretion by violating AMS and SIR requirements when it allowed LCI to remedy its deficient proposal, even though the Product Team could have eliminated LCI for its noncompliance under the SIR.

AMS § 3.2.2.3.1.2.2 provides that the "purpose of communications is to ensure there are mutual understandings between the FAA and the offerors about all aspects of the procurement, including the offerors' submittals/proposals." The SIR states that "[t]he purpose of communications is to ensure there are mutual understandings between FAA and the Offerors on all aspects of the procurement." AR at 590.

The FAA did not violate either provision. In this case, the Contracting Officer alerted LCI that part of its proposal failed to comply with the SIR, and LCI never

14

followed up or communicated further with the Product Team regarding the deficiencies. LCI does not explain how this type of communication, or breakdown thereof, implicates (let alone violates) either the SIR or AMS § 3.2.2.3.1.2.2. Both provisions only seem to state the purpose of communications between the FAA and offerors, and the communications in this case follow that purpose (i.e. the communications were never intentionally misleading or meant to give a competitive edge to any particular offeror).

LCI also declares that the Contracting Officer "departed from the AMS's requirement that an offeror be allowed to revise its proposal based on changed requirements." LCI Opening Br. 39 (citing AMS § 3.2.2.3.1.2.4). AMS § 3.2.2.3.1.2.4 provides that "[i]f, after release of a SIR, it is determined that there has been a change in the FAA's requirement(s), all offerors competing at that stage should be advised of the change(s) and afforded an opportunity to update their submittals accordingly." In this case, even assuming that font size was a "requirement" for AMS purposes, all offerors were notified of the font size requirement as of March 18, 2017, and proposals were due April 3, 2017. This provided LCI with ample opportunity to update its proposal accordingly.

2.     *Administrative Motion to Compel*

LCI sought discovery throughout its protest by requesting discovery related to other offerors' proposals. LCI argued the discovery would support its interpretation of section L.11.1 and allow LCI to challenge the Product Team's position that other offerors would be at a competitive disadvantage if LCI were allowed to revise its

15

proposal. LCI Opening Br. 43. The ODRA denied the motion to compel discovery, and now LCI asserts that the denial was an abuse of discretion.

As explained previously, section L.11.1 is either unambiguous or is patently ambiguous. If section L.11.1 fell within the latter category, LCI was required to raise the question prior to submitting its bid. As such, competitor proposals were unnecessary for ODRA to address whether section L.11.1 was patently ambiguous. Further, LCI has not demonstrated that the Product Team compared LCI's bid to others. LCI's bid was eliminated due its failure to meet certain score thresholds and not by a head-to-head comparison with any other offeror. Given that context, LCI has failed to establish that other proposals are relevant to the dispute. Therefore, LCI has not demonstrated that the FAA abused its discretion in denying LCI's administrative discovery motion.

### III

LCI's petition to review the final order of the FAA is DENIED. LCI's motion to supplement is also DENIED.[10]

Entered for the Court

Mary Beck Briscoe
Circuit Judge

---

[10] LCI and the FAA asked the court to seal certain filings in this case. *See* Dkt. 10542259, 10577869. Both requests were provisionally granted, *see* Dkt. 10542403, 10578211, and are now GRANTED.